**Nos. 14-9512 & 14-9514**

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF WYOMING AND WYOMING FARM BUREAU FEDERATION,
*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
E. SCOTT PRUITT, AND DEB THOMAS,
*Respondents*,

THE NORTHERN ARAPAHO TRIBE, EASTERN SHOSHONE TRIBE,
CITY OF RIVERTON, AND FREMONT COUNTY,
*Intervenors.*

On Appeal from a Final Order of the Environmental Protection Agency

**EASTERN SHOSHONE TRIBE'S PETITION FOR REHEARING EN BANC**

DONALD R. WHARTON
HEATHER D. WHITEMAN RUNS HIM
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
(303) 447-8760

DION KILLSBACK
ROSETTE LLP
565 West Chandler Boulevard, Suite 212
Chandler, Arizona 85225
(480) 889-8990

SETH P. WAXMAN
KENNETH L. SALAZAR
DANIEL S. VOLCHOK
ARPIT K. GARG
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

July 10, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................. 4

I.    THE PANEL DECISION CONFLICTS WITH SUPREME COURT
      PRECEDENT ...................................................................................... 4

      A.    *Ash Sheep* ............................................................................ 4

      B.    Diminishment Principles ..................................................... 6

II.   THE PANEL DECISION CREATES A CIRCUIT CONFLICT .................... 14

III.  THE PANEL DECISION HAS FAR-REACHING DELETERIOUS
      IMPLICATIONS ................................................................................ 16

CONCLUSION ......................................................................................... 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

APPENDIX

      Panel decision

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ash Sheep Co. v. United States*, 252 U.S. 159 (1920) .......................................1, 5, 7

*DeCoteau v. District County Court for Tenth Judicial District*,
    420 U.S. 425 (1975)..........................................................................2, 6, 7, 13

*Hagen v. Utah*, 510 U.S. 399 (1994) ..............................................................2, 6, 8

*In re General Adjudication of All Rights To Use Water in the Big
    Horn River System*, 753 P.2d 76 (Wyo. 1988) ...............................................16

*Mattz v. Arnett*, 412 U.S. 481 (1973)...................................................................8, 11

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973) .........................................16

*Nebraska v. Parker*, 136 S. Ct. 1072 (2016)..................................2, 6, 7, 11, 14, 16

*National Labor Relations Board v. Pueblo of San Juan*, 276 F.3d 1186
    (10th Cir. 2002) (en banc) ...............................................................................16

*Public Service Co. of New Mexico v. Barboan*, 857 F.3d 1101 (10th
    Cir. 2017)...........................................................................................................12

*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977).......................................5, 9, 10

*Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S.
    351 (1962)..................................................................................................8, 9, 11

*Solem v. Bartlett*, 465 U.S. 463 (1984)............................................................*passim*

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) ........................7, 10, 13

*United States v. Bryant*, 136 S. Ct. 1954 (2016)....................................................16

*United States v. Grey Bear*, 828 F.2d 1286 (8th Cir. 1987) ...............................1, 15

*United States v. Pelican*, 232 U.S. 442 (1914) ........................................................6

*Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc) ....................16

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ................................................. 12

## STATUTES AND RULES

25 U.S.C. §1911 ................................................................................ 16

10 Stat.
    1048 (1854) ................................................................................ 17
    1069 (1854) ................................................................................ 17
    1082 (1854) ................................................................................ 17

12 Stat. 1171 (1861) ........................................................................ 17

14 Stat. 687 (1865) .......................................................................... 17

18 Stat. 291 (1874) .......................................................................... 11

29 Stat. 321 (1896) .......................................................................... 17

30 Stat. 93 (1897) ............................................................................ 11

33 Stat.
    46 (1903) .................................................................................... 17
    319 (1904) .................................................................................. 15
    352 (1904) .................................................................................... 5
    1016 (1905) ............................................................... 3, 5, 7, 9, 10

34 Stat.
    80 (1906) .................................................................................... 8
    124 (1906) .................................................................................. 17

35 Stat. 460 (1908) ............................................................................ 8

36 Stat. 440 (1910) .......................................................................... 17

Federal Rule of Appellate Procedure 35 ........................................ 15

## OTHER AUTHORITIES

39 Cong. Rec. 1940 (1905) ............................................................ 14

The issue in this appeal is whether a 1905 statute "diminished" the Wind River Reservation in Wyoming.  Over a dissent, the panel ruled that the law did so, holding that—despite substantial contrary evidence—the statutory word "cede" was by itself proof of diminishment.  That ruling derogates core principles of the Supreme Court's diminishment cases, and specifically conflicts with *Ash Sheep Co. v. United States*, 252 U.S. 159 (1920).  It also conflicts with *United States v. Grey Bear*, 828 F.2d 1286 (8th Cir. 1987) (subsequent history omitted).  And it infringes the sovereignty of the Eastern Shoshone and Northern Arapaho Tribes, hindering the tribes' power to tax, exercise criminal jurisdiction over tribal members, resolve child-welfare issues, and claim water rights.  Finally, it has far-reaching implications because many other Indian statutes contain similar language. These circumstances warrant rehearing en banc.

## STATEMENT

1.     "Congress passed a series of surplus land Acts at the turn of the [20th] century to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement."  *Solem v. Bartlett*, 465 U.S. 463, 466-467 (1984).  "[S]ome surplus land Acts diminished reservations, and other[s] … did not."  *Id.* at 469 (citations omitted).  Acts in the former category changed the boundaries of a reservation, such that the affected land is no longer "Indian country" and the tribe can exercise no jurisdiction over it.  Acts in the

latter category, by contrast, preserved the reservation but opened land within it to settlement by non-Indians.

"The framework … employ[ed] to determine whether an Indian reservation has been diminished is well settled." *Nebraska v. Parker*, 136 S. Ct. 1072, 1078 (2016). Courts consider: (1) the statutory text, which is most probative; (2) negotiations and legislative history underlying the law; and (3) subsequent treatment of the land, which is least probative. *Id.* at 1079.

In applying this framework, the Supreme Court has repeatedly admonished that Congress's "intent to [diminish] must be clear," *id.*, and that the rule that "ambiguities are resolved to the benefit of the Indians" has "the broadest possible scope" in diminishment cases, *DeCoteau v. District County Court for Tenth Judicial District*, 420 U.S. 425, 447 (1975). The Court has also directed that surplus-land statutes be "read as a whole," *Solem*, 465 U.S. at 476, and that courts evaluating whether a diminishment occurred consider all relevant evidence together, i.e., "examine all the circumstances surrounding the opening of a reservation," *Hagen v. Utah*, 510 U.S. 399, 412 (1994).

2.    The Wind River Reservation was established in 1868, App.6, although the Shoshone's interest in the land stretches back much further. The law at issue here (the "Act") provided that the Wind River Indians "cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the

lands embraced within [their] reservation, except the lands within and bounded by the following lines….” 33 Stat. 1016, 1016 (1905). Furthermore, the United States would act as “trustee” in selling plots of land, with proceeds paid to the Indians. *Id.* at 1020.

In 2008, the Shoshone and Arapaho applied to the Environmental Protection Agency for authority to manage air-quality programs under the Clean Air Act. The application required the tribes to delineate the reservation’s boundaries, and petitioners objected to the delineation because it reflected no diminishment by the Act. EPA rejected petitioners’ objection, based principally on an Interior Department opinion concluding that the Act merely opened the reservation for settlement. Petitioners then sought this Court’s review.

A divided panel granted the petition, holding that the Act had diminished the reservation. This holding rested on step one of the Supreme Court’s framework (statutory text); the panel stated that historical evidence (step two) merely “confirms” Congress’s intent to diminish, App.23, and that subsequent treatment (step three) “does not impact [its] conclusion,” App.33; *see also* App.44 (dissent) (“[T]he majority does not appear to rest its holding … on the second and third steps.”). As to step one, the majority concluded that the Act’s cession language alone proved diminishment. As the panel put it, “Congress’s use of the word ‘cede’ can only mean one thing—a diminished reservation.” App.18; *accord*

App.22 ("express language of cession … indicates Congress intended to diminish the … Reservation").

Judge Lucero dissented, reasoning that the Act (and relevant extra-textual evidence) lacked the clarity required to effect a diminishment.  App.40-53.

## ARGUMENT

## I.    THE PANEL DECISION CONFLICTS WITH SUPREME COURT PRECEDENT

The panel's holding is doubly inconsistent with Supreme Court case law. First, it conflicts with *Ash Sheep*, which reached the contrary conclusion regarding a statute materially identical to the Act.  Second, the panel's ruling that the word "cede" alone proves diminishment flouts fundamental principles of the Court's diminishment precedent, including that all relevant evidence must be considered together and that diminishment can be found only if the evidence (considered together) unambiguously supports that finding.

### A.    *Ash Sheep*

The Act is remarkably similar to the statute addressed in *Ash Sheep* (perhaps not surprising given that the two were enacted by the same Congress, just eleven months apart).  For example, in language indistinguishable from the provision that the panel relied on—including the word "cede"—the *Ash Sheep* statute provided that the Crow Indians "cede, grant, and relinquish to the United States all right, title, and interest which they may have to the lands embraced within and bounded

by the following-described lines…."  33 Stat. 352, 356 (1904); *compare supra*

pp.2-3 (quoting the Act's counterpart).

Nor is the near identity limited to this core provision; it extends to other

provisions that the Supreme Court, as discussed in Part I.B., has repeatedly deemed

crucial in diminishment cases.  Both laws, for instance, provided that the United

States would not pay a fixed sum for the ceded land, but instead would advance

specific amounts for enumerated projects, then sell unallotted land and "pay the

proceeds to the Indians."  *Ash Sheep*, 252 U.S. at 165; *compare* 33 Stat. at 357-

358, *with id.* at 1017-1020.  Both statutes also identically described the United

States as a "trustee for said Indians to dispose of said lands," 33 Stat. at 361-362,

1021.  Both even referred in places to the "diminished reservation," *e.g.*, 33 Stat. at

359, 1018, although such references do not demonstrate diminishment, *see Solem*,

465 U.S. at 475 & n.17.  "Taking all of the[se] provisions … together," *Ash Sheep*

unanimously held that the ceded lands "did not become 'public lands'" but instead

remained "Indian lands."  252 U.S. at 166.  The panel was not free to reach the

opposite conclusion regarding an all-but-identical statute.

The panel's attempt to distinguish *Ash Sheep* is untenable.  Citing dicta from

a footnote in *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 601 n.24 (1977), the

panel asserted that *Ash Sheep* is not a diminishment case but a "public lands" case.

App.21-22.  The Supreme Court has rejected that distinction, holding in *Hagen* that

statutory language restoring land to the "public domain" is proof *of diminishment*. *See* 510 U.S. at 412 ("[W]hen lands … were 'restored' to the public domain … their previous public use [as reservation land] was extinguished."); *id.* at 414 ("[T]he restoration of … lands to the public domain evidences a congressional intent … inconsistent with … reservation status."); *see also id.* at 428 n.8 (Blackmun, J., dissenting) ("[T]his Court has used ['public domain'] interchangeably with … 'public lands.'" (citing cases)).[1]  The Supreme Court has also cited *Ash Sheep* in diminishment cases (for the proposition that the absence of a fixed payment for ceded land is textual evidence of no diminishment).  *See DeCoteau*, 420 U.S. at 448.  More generally, *Ash Sheep*'s reasoning, especially its textual analysis, is fully consistent with the Court's modern diminishment jurisprudence.  *See Parker*, 136 S. Ct. at 1079-1080; *Solem*, 465 U.S. at 472-473.  The panel's effort to explain away the conflict with *Ash Sheep* therefore fails.  That conflict requires correction by the en banc court.

## B.    Diminishment Principles

The panel's core holding, that "cede" alone proves diminishment, disregards the Supreme Court's repeated insistence that all relevant evidence be weighed together, and that diminishment be found only if that comprehensive balancing

---

[1]     *Rosebud*'s dicta was questionable even before *Hagen*:  The only case *Rosebud* cited to support its diminishment/public-lands dichotomy—*United States v. Pelican*, 232 U.S. 442 (1914)—provides no support.

unambiguously establishes it.  *See supra* p.2.  The panel's departure from these teachings was dispositive here, because there is significant evidence against diminishment.  Had the panel adhered to Supreme Court precedent—considering the evidence together and applying the "broadest possible" presumption against diminishment, *DeCoteau*, 420 U.S. at 447—it could not have found the necessary unambiguous evidence of congressional intent to diminish.

1.     The strongest evidence against diminishment is the Act's failure to authorize a sum-certain payment for the ceded land.  For decades, the Supreme Court has consistently held that if a "Tribe's profits [a]re entirely dependent upon how many nonmembers purchased … land," that indicates congressional intent to "open" land for settlement rather than to "diminish[]" the reservation.  *Parker*, 136 S. Ct. at 1079; *see also Solem*, 465 U.S. at 473-474 ("creation of Indian accounts for proceeds" suggests a reservation was "opened but … not diminish[ed]"); *DeCoteau*, 420 U.S. at 448 ("uncertain future sales" show an act "merely opened reservation land to settlement"); *Ash Sheep*, 252 U.S. at 165-166; *cf. South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 345 (1998) ("fixed payment" is a "hall-mark[] of congressional intent to diminish").  That is what the Act provides:  The United States guaranteed no payment, simply "agree[ing] to pay the said Indians the proceeds derived from the sale of said lands."  33 Stat. at 1020.

Perhaps to distinguish this case from those just cited, the panel characterized the Act as a "hybrid payment scheme" because it specified how certain land-sale proceeds would be spent. App.19-20; *see also* App.41 (dissent). But the laws in both *Solem* and *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962), did likewise, *see* 35 Stat. 460, 463 (1908); 34 Stat. 80, 82 (1906). In neither case did the Court suggest that these provisions constituted a "hybrid" rather than a no-fixed-payment scheme, or that they indicated an intent to diminish.

While the lack of a sum-certain payment does not always foreclose a finding of diminishment, App.20, the Supreme Court has found textual proof of diminishment absent a fixed payment *only* if the statute expressly restored land to the "public domain." *Hagen*, 510 U.S. at 414. The Act contains no "public domain" language. Nor does it contain anything like the other language the Court has labeled "clear language of express termination," namely "the … reservation is hereby discontinued" and "the reservation lines … are hereby[] abolished." *Mattz v. Arnett*, 412 U.S. 481, 504 n.22 (1973).

Given the importance the Court has repeatedly placed on sum-certain provisions, the Act's lack of such a provision at a minimum creates ambiguity regarding Congress's intent. Indeed, that is underscored by the panel's reliance on *Rosebud* in discussing this point (App.20-21), because the Court later explained that *Rosebud* involved textual ambiguity, *see Solem*, 465 U.S. at 469 n.10 ("[N]one

of the Rosebud Acts *clearly* severed the Tribe from … the unallotted opened lands." (emphasis added)); *Rosebud*, 420 U.S. at 605 (finding "unquestionabl[e]" intent to diminish from the legislative history); *contra* App.14-15 (suggesting *Rosebud* was a clear-text case).  Given the presumption against diminishment, *see supra* p.2, and the conceded lack here of unequivocal extra-textual evidence, *see infra* n.2, the Act's similar ambiguity required the panel to find no diminishment.

2.     The Act's trustee language is additional textual evidence against diminishment.  Under Supreme Court precedent, a statutory provision for the United States to "act as the Tribe's sales agent" suggests no intent to diminish. *Solem*, 465 U.S. at 473.  That is how the Act describes the United States' role: obligated not to purchase the opened land but merely to "act as trustee for said Indians to dispose of said lands."  33 Stat. at 1021.

In fact, the Act's trustee language is quite similar to that of the statute addressed in *Seymour*—where no diminishment was found.  The Court there explained that the law merely "open[ed] the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards."  368 U.S. at 356.  The same is true of the Act.

The panel responded to this by again citing *Rosebud*.  App.22.  But as explained, *Rosebud* involved textual ambiguity, and rested on unequivocal extra-

textual evidence.  Because even the panel did not see such evidence here, *see infra* n.2, the Act's textual ambiguity required the panel, under Supreme Court precedent, to find no diminishment.

3.      The Act's treatment of the opened lands is still more textual evidence against diminishment, as is the absence of a school-lands provision.  As to the former:  Tribal members were not forced off opened lands, 33 Stat. at 1016, which is revealing because "[i]t is difficult to imagine why Congress would have" allowed tribal members "to continue to obtain individual allotments on the affected portion of the reservation" unless it "anticipate[d] that the opened area would remain part of the reservation," *Solem*, 465 U.S. at 473.  And the omission of a school-lands provision—which the legislative history confirms was intentional, App.45-47 (dissent)—is important because the Supreme Court has repeatedly treated the inclusion of such a provision as strong evidence of diminishment.  *See Yankton Sioux*, 522 U.S. at 349-350; *Rosebud*, 430 U.S. at 599-601; *see also* App.47 (dissent) (responding to the panel's footnoted attempt to account for the Act's omission of a school-lands provision).

The panel agreed that these points "may cut against diminishment," App.32 n.13, but cited *Solem* for the proposition that the existence of contrary evidence is not dispositive.  App.32.  *Solem*, however, found *no* diminishment; it therefore stands for the proposition that mixed evidence of Congress's intent is insufficient

to find diminishment, given the presumption against it.  The panel's citation of *Solem* to support a holding that mixed evidence does not *preclude* a diminishment finding improperly flips *Solem*'s reasoning—and the presumption—on its head.

    4.    Lastly, prior agreements between the United States and the Shoshone further show that the Act did not diminish the reservation.

    As the Supreme Court reiterated last year, "Congress legislate[s] against the backdrop of" previous acts, and hence its intent can be discerned by comparing the statute at issue with "the text of earlier treaties between the United States and the Tribe."  *Parker*, 136 S. Ct. at 1080; *see also Seymour*, 368 U.S. at 355-356.  Here there are two prior accords, each of which indisputably effected a diminishment—using clearer language than the Act's.  The 1874 Lander Purchase was expressly intended "to change the southern limit of said reservation."  18 Stat. 291, 292.  And the 1897 Thermopolis Purchase, while using the word "cede" in the operative clause, not only "declared [the ceded territory] to be public lands" but also elaborated that the Shoshone were both surrendering their rights "of every kind and character" to the land and doing so "forever and absolutely."  30 Stat. 93, 94, 96.  The Act's omission of similar language "undermines petitioners' claim that Congress intended to do the same with the reservation's boundaries in [1905] as it did in 18[7]4 and 18[97]."  *Parker*, 136 S. Ct. at 1079; *accord Mattz*, 412 U.S. at 504 ("[F]rom 1871-1892 numerous bills were introduced which *expressly* provided

for the termination of the reservation and did so in unequivocal terms…. But clear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate[.]").

This conclusion follows not just as a matter of ordinary statutory construction—the Act's narrower language suggests that Congress intended something different than the prior agreements—but more specifically under the canon that agreements with tribes must be interpreted as "they would naturally be understood by the Indians." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979); *see also Public Service Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1109 (10th Cir. 2017). The Act's departure from the words that were earlier used to effect what all agree were diminishments sensibly led the Shoshone to understand the Act's dissimilar language as having a different effect.

*    *    *

The panel's approach to many of these myriad pieces of contrary textual evidence was to dismiss each on the ground that it is insufficient *by itself* to preclude diminishment. *E.g.*, App.20, 22. That "divide-and-conquer" strategy ignores the Supreme Court's directive that surplus-land statutes be read as a whole. *See supra* p.2. Had the panel followed that directive, it would have considered

together, rather than in isolation, (1) the Act's trustee language, (2) its allowance of Indian allotments on the ceded lands, and (3) its lack of:

- public-domain language;

- sum-certain language;

- school-lands language;

- anything like the language *Mattz* held sufficient to diminish; and

- language as clear as in prior agreements with the Shoshone that everyone understood would result in diminishment.

All this—considered collectively—makes it impossible to find the "substantial and compelling evidence of … intention to diminish," *Solem*, 465 U.S. at 472, required to overcome the "broadest possible" presumption against diminishment, *DeCoteau*, 420 U.S. at 447.

Not surprisingly, the panel cited no case finding diminishment in remotely similar circumstances. To the contrary, although the panel asserted that the Supreme Court had deemed cession language like the Act's "precisely suited" to diminishment, App.14, the cases it cited involved cession language plus something else, either a sum-certain (*Yankton Sioux* and *DeCoteau*) or unequivocal extra-textual evidence (*Rosebud*). *See, e.g.*, *Yankton Sioux*, 522 U.S. at 344 ("'cession' *and 'sum certain' language* is 'precisely suited' to terminating reservation status" (emphasis added)). The panel's "cede-proves-diminishment" holding departs

- 13 -

sharply from Supreme Court precedent, most clearly *Ash Sheep* but also other cases. Its decision should not stand.[2]

## II.  THE PANEL DECISION CREATES A CIRCUIT CONFLICT

Rehearing en banc is independently warranted because the decision conflicts with the Eighth Circuit's holding in *Grey Bear* that a law materially identical to the Act (and passed by the same Congress) did not diminish reservation boundaries. The tribe in *Grey Bear* had agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in" reservation land, in return

---

[2]     Absent clear textual evidence, a diminishment finding requires "unequivocal evidence" of a "widely held, contemporaneous understanding that the affected reservation would shrink." *Parker*, 136 S. Ct. at 1079, 1080. Although the panel discussed extra-textual evidence at length, *see* App.23-39, it did not find such unequivocal evidence, concluding that it "need not search for unequivocal [non-textual] evidence" because the "statutory language evinces a congressional intent of diminishment," App.23; *see also* App.33 (legislative history demonstrates diminishment only when "taken together with the Act's plain language"), App.37 (similar).

In any event, as Judge Lucero explained, App.45-50, the historical evidence is manifestly mixed, and thus "cannot overcome the lack of a clear textual signal that Congress intended to diminish," *Parker*, 136 S. Ct. at 1080. For example, debate over the Act's effect on Asmus Boysen (a non-Indian coal lessee) shows that even members of Congress deemed the statute unclear regarding diminishment. *See* 39 Cong. Rec. 1940, 1945 (1905) (statement of Rep. Marshall). Likewise, James McLaughlin's statements (on which the panel relied) often suggested no diminishment. For instance, although McLaughlin referred in negotiations with the Shoshone to cession and a diminished reservation, he began those negotiations by stating—a statement that provides the context for what followed—that he had "a proposition for the *opening* of certain portions of your reservation for settlement by the whites." App.26 (emphasis added).

for, not a sum-certain payment, but rather "funds accruing from the sale of said lands." 33 Stat. 319, 321 (1904). There was also a "trustee" provision like the Act's. *Id.* at 324. *Grey Bear* reasoned that "although the 'cede, surrender, grant, and convey' language … suggests congressional intent to disestablish," the statute "does not contain an *unconditional* commitment by Congress to pay the tribe for the ceded lands." 828 F.2d at 1290. "[S]tanding alone," the court held, "'cede' language does not evince a clear congressional intent to disestablish." *Id.* That is directly contrary to the holding here.

The majority's sole response to *Grey Bear* was that "the legislative history of the act" in that case "was quite limited, and the subsequent treatment of the area strongly indicated Congress did not view the act as disestablishing the reservation." App.17 n.6. As Judge Lucero observed, however, the majority's interpretation of the Act did not rest on legislative history or subsequent events, but simply on the statutory text. App.44 (dissent). "The majority thus reache[d] a conclusion squarely opposite to" *Grey Bear*, "creating a needless circuit split." *Id.* That split is a "question[] of exceptional importance," warranting en banc review. Fed. R. App. P. 35(b)(1)(B).

### III.   THE PANEL DECISION HAS FAR-REACHING DELETERIOUS IMPLICATIONS

A third independently sufficient basis for rehearing is the significant harm the panel's decision will cause—not only to the Shoshone and Arapaho but also to other tribes affected by laws with language similar to the Act.

1.     The impact of diminishment on affected tribes is hard to overstate. On non-reservation land, for example, tribes cannot tax non-Indians, *Parker*, 136 S. Ct. at 1078; exercise criminal jurisdiction over Indians, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-149 (1973); or resolve "child custody proceeding[s]" under the Indian Child Welfare Act, 25 U.S.C. §1911.  Diminishment can also lead to relinquishment of water rights, *In re General Adjudication of All Rights To Use Water in the Big Horn River System*, 753 P.2d 76, 93 (Wyo. 1988) (subsequent history omitted), a vital revenue stream for the Shoshone.

More fundamentally, Indian tribes are "separate sovereigns pre-existing the Constitution."  *United States v. Bryant*, 136 S. Ct. 1954, 1962 (2016).  The panel's ruling reduces the territory of two such sovereigns.  That is a monumental decision. *See National Labor Relations Board v. Pueblo of San Juan*, 276 F.3d 1186, 1195 (10th Cir. 2002) (en banc) ("We … do not lightly construe federal laws as working a divestment of tribal sovereignty[.]").  Ensuring its correctness—particularly given that it was issued by only two judges, and given the substantial arguments discussed above that it is wrong—deserves the full court's attention.  *See Ute*

*Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc) (subsequent history omitted) (convening en banc to consider diminishment).

2.    The panel's holding would have broad repercussions, because "cede" or similar language is present in other Indian statutes that also lack a sum-certain payment (and often have other indicia of no diminishment).  There are at least nine such statutes, even putting aside those addressed in *Ash Sheep* and *Grey Bear*:  36 Stat. 440 (1910) (Pine Ridge Indians); 34 Stat. 124 (1906) (Lower Brule Indians); 33 Stat. 46 (1903) (Red Lake); 29 Stat. 321 (1896) (San Carlos); 14 Stat. 687 (1865) (Osage); 12 Stat. 1171 (1861) (Sacs, Foxes, Iowas); 10 Stat. 1082 (1854) (Kaskasias, etc.); 10 Stat. 1069 (1854) (Ioways); 10 Stat. 1048 (1854) (Delawares). If other courts followed the panel's holding (and of course those within the circuit would have to), they would pretermit the appropriate analysis and prematurely conclude—likely incorrectly under Supreme Court precedent—that these statutes diminished reservation boundaries.  Preventing such far-reaching harm to independent sovereigns around the country justifies en banc review.

## CONCLUSION

Rehearing en banc should be granted.

Respectfully submitted,

/s/ Seth P. Waxman

DONALD R. WHARTON
HEATHER D. WHITEMAN RUNS HIM
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
(303) 447-8760

DION KILLSBACK
ROSETTE LLP
565 West Chandler Boulevard, Suite 212
Chandler, Arizona 85225
(480) 889-8990

SETH P. WAXMAN
KENNETH L. SALAZAR
DANIEL S. VOLCHOK
ARPIT K. GARG
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

July 10, 2017

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) in that—according to the word-count feature of the word-processing program with which it was prepared (Microsoft Word)—the petition contains 3,900 words, excluding the portions exempted by Rule 32(f).

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## CERTIFICATE OF DIGITAL SUBMISSION

No privacy redactions were required in this petition and hence no such redactions were made. The electronic version of the petition has been scanned for viruses using Cylance Protect (version 2.0.1430.18, updated July 10, 2017) and is, according to that program, free of viruses. The electronically filed version of the petition is an exact copy of the paper version filed with the clerk.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## CERTIFICATE OF SERVICE

On this 10th day of July, 2017, I electronically filed this petition (including attachments) using the Court's appellate CM/ECF system. Counsel for all parties to this case are registered CM/ECF users and will be served by that system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

# APPENDIX

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2017**

**PUBLISH**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING, and
WYOMING FARM BUREAU
FEDERATION

        Petitioners,

        v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; E. SCOTT
PRUITT, in his official capacity as
Administrator of the United States
Environmental Protection Agency; DEB
THOMAS, in her official capacity as
Acting Region 8 Administrator of the
United States Environmental Protection
Agency,[*]

        Respondents.

----------------------------------------------

THE NORTHERN ARAPAHO TRIBE;
EASTERN SHOSHONE TRIBE; CITY OF
RIVERTON, WYOMING; FREMONT
COUNTY, WYOMING,

        Intervenors.

Nos. 14-9512 and 14-9514

---

[*] Pursuant to Fed. R. App. P. 43(c)(2) E. Scott Pruitt is substituted for
Gina McCarthy as the Administrator of the United States Environmental
Protection Agency, and Deb Thomas is substituted for Shaun McGrath as the
Acting Region 8 Administrator of the United States Environmental Protection
Agency.

**App.1**

---------------------------------------------

STATE OF IDAHO; STATE OF
ALABAMA; STATE OF COLORADO;
STATE OF KANSAS; STATE OF
MONTANA; STATE OF NEBRASKA;
STATE OF NORTH DAKOTA; STATE OF
OKLAHOMA; STATE OF SOUTH
DAKOTA; STATE OF UTAH; INDIAN
LAW PROFESSORS; RIVERTON
MEMORIAL HOSPITAL, LLC,

   Amici Curiae.

---

**PETITION FOR REVIEW OF A FINAL ORDER FROM THE
ENVIRONMENTAL PROTECTION AGENCY
(NO. EPA-1-R08-2013-0007)**

---

Michael McGrady (Peter K. Michael, Wyoming Attorney General, Jay Jerde and
James Kaste with him on the briefs), Office of the Attorney General for the State
of Wyoming, Cheyenne, Wyoming, for Petitioner State of Wyoming.

Gina Cannan (Steven J. Lechner with her on the briefs), Mountain States Legal
Foundation, Lakewood, Colorado, for Petitioner Wyoming Farm Bureau
Federation.

Samuel C. Alexander, Chief, Indian Resources Section (John C. Cruden, Assistant
Attorney General, Washington, D.C., and David A. Carson, Environmental
Defense Section, Denver, Colorado, with him on the briefs) Environment and
Natural Resources Division, United States Department of Justice, Washington,
D.C., for Respondents.

Kelly A. Rudd (Andrew W. Baldwin, Berthenia S. Crocker, and Janet E. Millard
with him on the briefs) Baldwin, Crocker & Rudd, Lander, Wyoming, for
Intervenor Northern Arapaho Tribe.

Donald R. Wharton (Robert Hitchcock, Eastern Shoshone Tribe, Office of the
Attorney General, Fort Washakie, Wyoming, with him on the briefs), Native
American Rights Fund, Boulder, Colorado, for Intervenor Eastern Shoshone
Tribe.

**App.2**

Jodi A. Darrough, Deputy Fremont County Attorney, and Rick L. Sollars, City Attorney, City of Riverton, Wyoming, on the briefs for Intervenors Fremont County and City of Riverton, Wyoming.

Lawrence G. Wasden, Attorney General, Steven L. Olsen, Chief of Civil Litigation, and Clay R. Smith, Deputy Attorney General, Boise, Idaho, Luther Strange, Attorney General, Montgomery, Alabama, John Suthers, Attorney General, Denver, Colorado, Derek Schmidt, Attorney General, Topeka, Kansas; Tim Fox, Attorney General, Helena, Montana, Jon Bruning, Attorney General, Lincoln, Nebraska; Wayne Stenehjem, Attorney General, Bismark, North Dakota, E. Scott Pruitt, Attorney General, Oklahoma City, Oklahoma, Marty Jackley, Attorney General, Pierre, South Dakota, and Sean D. Reyes, Attorney General, Salt Lake City, Utah, on the brief for Amici Curiae States of Idaho, Alabama, Colorado, Kansas, Montana, Nebraska, North Dakota, Oklahoma, South Dakota, and Utah.

Colette Routel, William Mitchell College of Law, Saint Paul, Minnesota, Bethany Berger, University of Connecticut School of Law, Hartford, Connecticut, and Sarah Wheelock, Tilden McCoy + Dilweg LLP, Sioux City, Iowa, on the brief for Amici Curiae Indian Law Professors.

Kevin J. Kuhn, LaMar F. Jost, and H. Camille Papini-Chapla, Wheeler Trigg O'Donnell LLP, Denver, Colorado, and Patrick J. Murphy, Williams, Porter, Day & Neville, P.C., Casper, Wyoming, on the brief for Amicus Curiae Riverton Memorial Hospital, LLC.

---

Before **TYMKOVICH**, Chief Judge, **KELLY**, and **LUCERO**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

This case requires us to determine whether Congress diminished the boundaries of the Wind River Reservation in Wyoming in l905.  We find that it did.

-3-

**App.3**

The Eastern Shoshone and Northern Arapaho Tribes jointly inhabit the Wind River Reservation.  The State of Wyoming and the Wyoming Farm Bureau Federation challenge a decision by the Environmental Protection Agency granting the Tribes' application for joint authority to administer certain non-regulatory programs under the Clean Air Act on the Reservation.  As part of their application for administrative authority, the Tribes were required to show they possess jurisdiction over the relevant land.  In their application, the Tribes described the boundaries of the Wind River Reservation and asserted that most of the land within the original 1868 boundaries fell within their jurisdiction.

Wyoming and others submitted comments to the EPA arguing the Reservation had been diminished in 1905 by act of Congress, and that some land described in the application was no longer within tribal jurisdiction.  After review, the EPA determined the Reservation had not been diminished in 1905 and the Tribes retained jurisdiction over the land at issue.  Because the EPA decided the Tribes otherwise satisfied Clean Air Act program requirements, it granted their application.

Wyoming and the Farm Bureau appealed the EPA's Reservation boundary determination.  Regionally applicable final actions of the EPA are directly appealable to this court.  Exercising jurisdiction under 42 U.S.C. § 7607(b)(1), we grant the petition for review, vacate the EPA's boundary determination, and

-4-

**App.4**

remand for further proceedings consistent with this opinion. We find by its 1905

legislation, Congress evinced a clear intent to diminish the Reservation.

## I. Background

The history of federal Indian policy in the United States is marked by a

series of eras, each characterized by a different approach to the inevitable conflict

between the Native Americans who inhabited western America and homesteaders

flooding west in search of a better life. *Cohen's Handbook of Federal Indian Law*

7–8 (Nell Jessup Newton et al. eds., 2012). The story of the Wind River

Reservation begins in the second half of the nineteenth century, when a new

federal policy of allotment and assimilation began to take shape, which followed

a period when Indian reservations were created throughout the western United

States. Unsurprisingly, westward expansion placed pressures on the traditional

lifestyles of the Native American tribes. Recognizing the potential for conflicts,

particularly over land, the United States negotiated a series of treaties and

agreements with dozens of tribes, including the Eastern Shoshone.

The Eastern Shoshone are part of the larger Shoshone Tribe, who in the

mid-nineteenth century inhabited what would become the states of Colorado,

Idaho, Nevada, Utah, and Wyoming. Henry Stamm, *People of the Wind River* 9

(1999). In 1863, the United States and the Eastern Shoshone entered into the

First Treaty of Fort Bridger, 18 Stat. 685 (1863), which established "Shoshonee

County," an area encompassing more than forty-four million acres. *See United*

**App.5**

*States v. Shoshone Tribe of Indians of Wind River Reservation of Wyo.*, 304 U.S. 111, 113 (1938). But the treaty proved to be short lived. With the end of the Civil War, a new wave of settlers forged westward. Fearing the Eastern Shoshone's homeland would be settled and thus lost forever, the tribal leader, Chief Washakie, urged the United States to reserve the Wind River Valley—the Tribe's historic buffalo hunting grounds—as the Eastern Shoshone's permanent homeland.

Chief Washakie's efforts were successful: in 1868, the United States and the Eastern Shoshone Tribe signed the Second Treaty of Fort Bridger, 15 Stat. 673 (1868). This treaty set aside roughly three million acres for exclusive tribal use. In exchange, the Tribe relinquished its claim to the land held under the 1863 treaty. *Shoshone*, 304 U.S. at 113. As it had promised, the United States developed the Reservation's infrastructure and began to establish and expand agricultural lands in an effort to aid the Eastern Shoshone's transition away from hunting wild game, which was rapidly disappearing. For their part, the Eastern Shoshone resolved to settle permanently on the Reservation, pursue an agrarian lifestyle, and send their children to school. But land issues persisted: settlers vied for agricultural lands south of the Big Wind River, and the Reservation's superintendent feared it would be impossible to observe the boundaries created by the 1868 treaty.

-6-

**App.6**

Meanwhile, Congress had departed from its previous policy of segregating tribes from homesteaders in favor of a new policy of educating Native American children in residential boarding schools and splitting up communal, tribally owned reservations into individual, privately owned parcels of land.  Judith V. Royster, *The Legacy of Allotment*, 27 Ariz. St. L.J. 1, 7–9 (1995).  At the time, Congress, and indeed most of America, assumed the reservation system would eventually cease to exist and members of Native American tribes would become fully assimilated into American society.  *See Solem v. Bartlett*, 465 U.S. 463, 468 (1984); Marta Adams et al., *American Indian Law Deskbook* 93 (2015).  Thus, reservations began to shrink in size.  In 1874, the Eastern Shoshone Tribe sold all of its land south of the forty-third parallel in the so-called Lander Purchase in exchange for a payment of $25,000.  18 Stat. 291, 292 (1874).  According to the ratifying act, this transaction "change[d] the southern limit of said reservation." 18 Stat. at 292.  Around this time, the Northern Arapaho—traditionally, an enemy of the Eastern Shoshone—joined the Eastern Shoshone on the Wind River Reservation, where they remain today.  1877 Comm'r Indian Aff. Ann. Rep. 19.

The Wind River Reservation boundaries changed again in 1897, when Congress passed legislation purchasing additional land.  That act, known as the Thermopolis Purchase, provided that, in exchange for $60,000, the Tribes agreed to "cede, convey, transfer, relinquish, and surrender forever and absolutely all their right, title, and interest of every kind and character" in a tract around the Big

**App.7**

Horn Hot Springs, located on the northern boundary of the Reservation. 30 Stat.
93, 94 (1897). Following up on failed efforts to acquire additional land from the
Tribes in 1891 and 1893, in 1904 Representative Frank Mondell of Wyoming
introduced a bill initiating the cession of the land north of the Big Wind River
flowing through the north-central portion of the Reservation. The 1904
legislation was the framework for negotiations with the Tribes, which the Tribes
ultimately agreed to as amended. Congress passed the 1904 agreement in 1905.
33 Stat. 1016 (1905). It is the 1905 Act that is at issue in this case.

   But the 1905 Act was not the last piece of legislation affecting the
Reservation. In 1934, Congress enacted the Indian Reorganization Act, the first
step in its new national policy of tribal self-determination. *See* 48 Stat. 984
(1934). Since the Tribes voted to exclude themselves from this Act, however,
Congress had to pass specific legislation to carry out its new policies on the Wind
River Reservation. Thus, in 1939, Congress directed the Secretary of the Interior
to restore to tribal ownership any unsold lands in the area that had been ceded in
1905. 53 Stat. 1128, 1129 (1939).

   That brings us to the present day. Currently, approximately seventy-five
percent of the land affected by the 1905 Act is held in trust by the United States
for the Tribes and their members. In 2008, the Tribes applied to the EPA for
authority to manage certain non-regulatory programs for air quality in areas under
tribal jurisdiction. They were able to do so because in 1990, Congress amended

-8-

**App.8**

the Clean Air Act, 42 U.S.C. §§ 7401–671 (CAA), to authorize the EPA to treat Native American tribes as states for the purposes of the CAA. § 7601(d). Pursuant to this grant of authority, the EPA promulgated the Tribal Authority Rule, 40 C.F.R. 49, under which qualified tribes may apply for authority to implement and manage programs for air quality in areas under tribal jurisdiction. 42 U.S.C. § 7601(d)(2)(B).

A successful application must describe the area over which a tribe seeks to assert its regulatory authority. Thus, in their application, the Tribes had to specify the proposed scope of their regulatory jurisdiction, which required them to clearly delineate the boundaries of the Reservation. The Tribes claimed the boundaries of the Wind River Reservation were those set forth in the 1868 treaty, reduced only by the Lander and Thermopolis transactions. As required by the CAA, the EPA notified all governmental entities located contiguous to the Reservation and provided local government and the general public notice and an opportunity to comment on the proposed boundary description. When a treatment-as-a-state application is subject to an objection, EPA may also request additional information or consult with the Department of the Interior. 40 C.F.R. § 49.9(d).

In their comments, Wyoming and the Farm Bureau argued the Reservation was diminished by the 1905 Act, which, they contended, established the current boundaries of the Reservation. Based on these objections, the EPA asked the

**App.9**

Department of the Interior for an analysis of the competing claims. In 2011, the

solicitor issued a legal opinion concluding the 1905 Act had not changed the

boundaries established by the 1868 treaty. Relying on this analysis, the EPA

issued its final decision granting the Tribes' application. The decision agreed

with the Tribes' interpretation that the 1905 Act did not diminish the boundaries

of the Reservation.

## II. Analysis

Our task here is limited: we must determine whether Congress diminished

the Wind River Reservation in 1905 by legislative act.[1] As we have previously

---

[1] We must also address two jurisdictional issues:

(1) In response to the court's November 17, 2015 order for supplemental briefing regarding a mootness issue raised during oral argument, we have reviewed the parties' and intervenors' supplemental briefs and find this case is not moot. Mootness is a threshold requirement: without the existence of a live case or controversy, we cannot constitutionally exercise jurisdiction over a claim. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010). For a live controversy to exist, a present determination of the issues must have "some effect in the real world," and the parties must retain a concrete interest in the outcome of the litigation. *Id.* at 1109–10. Here, even though the EPA has revoked the Tribes' funding under the CAA, the EPA's determination of the Reservation boundaries still stands, and the EPA has not indicated it will reconsider its decision. Because the boundary determination affects the present and future rights and responsibilities of the parties, the case is not moot.

(2) We also find the Wyoming Farm Bureau has standing to sue on behalf of its members. For an organization to bring suit in its representative capacity, it must show, among other things, that "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Standing requires a concrete and particularized injury that is

(continued...)

-10-

**App.10**

explained, only Congress has the power to diminish reservation boundaries, and

its intent "must be clearly expressed."  *Osage Nation v. Irby*, 597 F.3d 1117,

1121–22 (10th Cir. 2010).  Even further, diminishment "will not be lightly

inferred."  *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).  Nevertheless, we may not

"'ignore plain language that, viewed in historical context and given a fair

appraisal clearly runs counter to a tribe's later claims.'"  *Osage Nation*, 597 F.3d

at 1122 (quoting *Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387,

1393 (10th Cir. 1990)).

The Supreme Court has declined to infer a congressional purpose of

diminishment from the passage of every surplus land act during the allotment and

assimilation period.  "Rather, it is settled law that some surplus land acts

diminished reservations, and other surplus land acts did not."  *Solem*, 465 U.S. at

469 (citations omitted).  "The effect of any given surplus land Act depends on the

language of the Act and the circumstances underlying its passage."  *Id.*  To

determine whether the 1905 Act had the effect of diminishing the Reservation, we

---

[1](...continued)
traceable to the defendant's conduct and redressable by a favorable court
decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In this
case, some Farm Bureau members own farms within the disputed area and face
the costs of complying with a new regulatory regime following the EPA's
decision.  We have previously recognized precisely this type of injury as
sufficiently concrete and particularized.  *See Hydro Res., Inc. v. EPA*, 608 F.3d
1131, 1144 (10th Cir. 2010).  And since the alleged injuries are clearly traceable
to the EPA's decision and would be redressed by a reversal of that decision, Farm
Bureau members have standing to sue in their own right.  Therefore, we find the
Farm Bureau has standing to sue on behalf of its members.

**App.11**

look to the well-settled approach described in *Solem*, where the Court outlined a

hierarchical, three-step framework to ascertain congressional intent.

     *First*, we look to the text of the statute, because it is "[t]he most probative

evidence of congressional intent." *Id*. at 470; *see also Nebraska v. Parker*, 136 S.

Ct. 1072, 1079 (2016) ("[W]e start with the statutory text, for '[t]he most

probative evidence of diminishment is, of course, the statutory language used to

open Indian lands.'" (citation omitted) (second alteration in original)).

     *Second*, we examine the circumstances surrounding the passage of the act,

"particularly the manner in which the transaction was negotiated with the tribes

involved and the tenor of legislative reports presented to Congress." *Solem*, 465

U.S. at 471; *see also Parker*, 136 S. Ct. at 1079; *South Dakota v. Yankton Sioux

Tribe*, 522 U.S. 329, 351–52 (1998).

     *Third* and finally, "to a lesser extent," we look to "the subsequent treatment

of the area in question and the pattern of settlement there." *Id*. at 344; *Solem*, 465

U.S. at 471–72.

     In doing so, we afford no deference to the EPA's boundary determination.

As our precedents tell us, "'the Supreme Court has applied, without comment, a

de novo standard of review in determining congressional intent [regarding

reservation boundary diminishment].'" *Osage Nation*, 597 F.3d at 1122

(alteration in original) (quoting *Yazzie*, 909 F.2d at 1393). Although examination

of the historical record "involves a mixed question of law and fact," de novo

review is appropriate "[w]here a mixed question 'primarily involves the consideration of legal principles.'" *Id.* at 1393–94 (quoting *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986)).  The EPA does not dispute this standard of review, because it concedes a de novo standard is "consistent with the [Administrative Procedure Act's] 'otherwise not in accordance with the law' standard,"  Aple. EPA Br. 23, which we apply to the agency action here.

### A.  *The Text of the 1905 Act*

We begin our analysis with the 1905 Act's operative language, for "[s]tatutory language is the most probative evidence of congressional intent to disestablish or diminish a reservation." *Osage Nation*, 597 F.3d at 1122–23. "'Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands.'" *Id.* at 1123 (quoting *Solem*, 465 U.S. at 470).  There are no magic words of cession required to find diminishment.  Rather, the statutory language, whatever it may be, must "establis[h] an express congressional purpose to diminish." *Hagen v. Utah*, 510 U.S. 399, 411 (1994).

Here, Article I of the 1905 Act reads,

> The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby *cede, grant, and relinquish to the United States, all right, title, and interest* which they may have to

-13-

**App.13**

> all the lands embraced within said reservation, except the
> lands within and bounded by the following lines . . . .

33 Stat. at 1016 (emphasis added).  This language of cession aligns with the type

of language the Supreme Court has called "precisely suited" to diminishment.

*Yankton Sioux*, 522 U.S. at 344.  Indeed, it is nearly identical to the statutory

language in cases where the Supreme Court has found a congressional purpose to

diminish a reservation in the statute's text.

For example, in *DeCoteau v. District County Court for the Tenth Judicial

District*, the Court considered an act providing that the Sisseton-Wahpeton Tribe

agreed to "cede, sell, relinquish, and convey to the United States all their claim,

right, title, and interest in and to all the unallotted lands within the limits of the

reservation."  420 U.S. 425, 445 (1975).  The Court found this language was

precisely suited to a congressional purpose of terminating the Lake Traverse

Indian Reservation.  *Id.*  Similarly, in *Rosebud Sioux Tribe v. Kneip*, the Court

held Congress clearly evinced an intent to diminish the boundaries of the Rosebud

Sioux Reservation when it passed a series of acts affecting unallotted lands on

that reservation.  430 U.S. 584, 615 (1977).  The first act, passed in 1904,

provided that the Rosebud Sioux Tribe agreed to "cede, surrender, grant, and

convey to the United States all their claim, right, title, and interest in and to" the

**App.14**

unallotted portion of its reservation. *Id.* at 597. This too, the Court held, was language precisely suited to diminishment. *Id.*[2]

Two decades later, in *Hagen*, the Court found Congress evinced a clear intent to diminish a reservation even when it employed less express language of cession. The operative language of the statute at issue provided that "all the unallotted lands within said reservation shall be restored to the public domain." 510 U.S. at 412. The Court held this language evidenced a congressional intent "inconsistent with the continuation of reservation status." *Id.* at 414.[3] And in *Yankton Sioux*, the Court unanimously held Congress spoke with a clear purpose of diminishment when it passed an act providing that the Yankton Sioux Tribe would "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation." 522 U.S. at 344, 351.

---

[2] Although the 1907 and 1910 Acts in *Rosebud* merely authorized the Secretary of the Interior "to sell or dispose of" the unallotted portions, the court found a "continuity of intent" from the earlier 1904 Act and a 1901 agreement, based on the circumstances surrounding the passage of the later acts. *Id.* at 606–13.

[3] Citing to *Hagen*, the EPA argues that when the operative language does not restore ceded lands to the public domain, diminishment is less likely. We disagree. While the Court in *Hagen* found language restoring lands to the public domain probative of congressional intent to diminish a reservation, nowhere did it suggest the *absence* of public domain language cuts against diminishment— especially where, as here, the statute's operative language includes even stronger language of cession than in *Hagen*.

-15-

**App.15**

In contrast, in cases where the Court has found a lack of clear congressional intent to diminish, the operative language of the statutes merely opened a reservation to settlement by non-Indians or authorized the Secretary of the Interior to act as a "sales agent" for the Native American tribes. For example, in *Seymour v. Superintendent of Wash. State Penitentiary*, the Court concluded that an act providing "for the sale of mineral lands and for the settlement and entry under the homestead laws of surplus lands remaining on the diminished Colville Reservation after allotments were first made . . . did no more than open the way for non-Indian settlers to own land on the reservation."[4] 368 U.S. 351, 354–56 (1962). Similarly, in *Mattz v. Arnett*, the Court held an act providing that lands within a reservation were "subject to settlement, entry, and purchase" did not, on its own, "recite or even suggest that Congress intended thereby to terminate the Klamath River Reservation." 412 U.S. 481, 495–97 (1973).

The operative language in *Solem* itself was similar: the act merely "authorized and directed" the Secretary of the Interior "to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations" within the described boundaries. 465 U.S. at 472–73. The Court compared the language

---

[4] The Tenth Circuit distinguished *Seymour* in *Ellis v. Page*, stating, "It is one thing to open an Indian Reservation to mineral exploitation, allotment to Indians, and non-Indian homesteaders by Congressional enactment as in *Seymour*. It is quite another to agree by treaty to cede and relinquish all claim, title and interest in the lands within the limits of a reservation." 351 F.2d 250, 252 (10th Cir. 1965).

-16-

**App.16**

to the acts in *Rosebud* and *DeCoteau* and concluded that unlike in those cases, "the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent." *Id.* at 473.  The Court added, "Nowhere else in the Act is there specific reference to the cession of Indian interests in the opened lands or any change in existing reservation boundaries." *Id.* at 474.[5]  Likewise, just last year in *Parker*, the Court held that an act stating the disputed lands would be "'open for settlement under such rules and regulations as [the Secretary of the Interior] may prescribe,'" 136 S. Ct. at 1079 (alteration in original) (quoting 22 Stat. 341 (1882)), fell into the category of acts that "'merely opened reservation land to settlement,'" *id.* (quoting *DeCoteau*, 420 U.S. at 448).[6]

Plainly, the 1905 Act falls into the first line of cases: those with express language of cession.  Nevertheless, the EPA and the Tribes argue that Congress's

---

[5]  The Court in *Solem* did acknowledge that language of diminishment present elsewhere in the act undisputedly supported the view that the reservation had been diminished.  465 U.S. at 474–75.  Without express language of cession, however, isolated references to diminishment alone could not "carry the burden of establishing an express congressional purpose to diminish." *Id.* at 475.  Here, in addition to the express language of cession in Article I, Articles I, III, IV, VI, and IX of the 1905 Act refer to the diminished reservation.  33 Stat. at 1016, 1017, 1018, 1020, 1022.

[6]  The EPA points to a circuit case, *United States v. Grey Bear*, which it argues falls outside this framework.  828 F.2d 1286 (8th Cir. 1987).  That case involved an interpretation of cession language for the Devils Lake Indian Reservation that is similar to *Rosebud*, *DeCoteau*, and here, but unlike these cases, the legislative history of the act was quite limited, and the subsequent treatment of the area strongly indicated Congress did not view the act as disestablishing the reservation. *Id.* at 1290–91.

intent remains unclear, because of the absence of words such as "sell" or

"convey" that were present in other statutes during the period.  But our task is not

to divine why Congress may have chosen certain synonyms over others in this

particular Act.  We believe Congress's use of the word "cede" can only mean one

thing—a diminished reservation.  A review of several  dictionaries from the turn

of the twentieth century confirms that adding the words "sell" or "convey" would

not materially change the intent Congress evinced in the 1905 Act.[7]  And in any

event, Article II of the 1905 Act includes the word "conveyed":

---

[7]  Adding the words "convey" or "sell" to Article I would not have materially altered Congress's expression of its intent, since the contemporaneous definitions of "cede," "grant," and "relinquish" were virtually indistinguishable from the definitions of "convey" and "sell."  For example, at the time, "cede" was defined as "[t]o yield or surrender, give up."  *Webster's Commonsense Dictionary* 76 (J.T. Thompson ed., 1902).  Likewise, "grant" was defined as "[t]o allow, yield, concede; to bestow or confer, in answer to prayer or request; to make conveyance of, give the possession or title of."  *Webster's Practical Dictionary* 165–66 (1906). And "relinquish" was defined as "[t]o give up the possession or occupancy of; to quit; to forsake; to abandon; to give up; to resign," *Webster's Commonsense Dictionary* 405, or "[t]o withdraw from, leave behind; to give up, renounce a claim to, resign, quit, forsake, abandon, forego," *Webster's Practical Dictionary* 342.

By way of comparison, "convey" was defined as "to transfer to another, make over," *id.* 81, and "[t]o carry; to remove; to transmit," *Webster's Commonsense Dictionary* 105.  "Sell" was defined as "[t]o give or deliver in exchange for some equivalent; to exchange for money," *id.* 438, and "[t]o transfer to another for an equivalent; to dispose of in return for something, esp. for money," *Webster's Practical Dictionary* 361.  It is true the word "sell" could add the notion of an exchange for money, but the Supreme Court has found a statute's operative language to be "precisely suited" to diminishment without the presence of the word "sell."  *See Rosebud*, 430 U.S. at 597.

-18-

**App.18**

> In consideration of the lands *ceded, granted, relinquished, and conveyed* by Article I of this agreement, the United States stipulates and agrees to dispose of the same, as hereinafter provided . . . .

33 Stat. at 1019–20 (emphasis added).[8]

The EPA and the Tribes also argue the 1905 Act does not evince a clear congressional intent to diminish the Reservation, because it lacks unconditional payment of sum certain compensation in conjunction with cession. The 1905 Act does not provide for a single, lump-sum payment, but rather outlines a hybrid payment scheme, under which different amounts derived from the proceeds of sales of the ceded lands are allocated to specific funds. For example, the 1905 Act provides $150,000 for "the construction and extension of an irrigation system within the diminished reservation," $50,000 for a school fund, and $50,000 for the purchase of livestock. 33 Stat. 1017–18. The Act also creates a general welfare and improvement fund and appropriates $85,000 for per capita payments of $50 each. 33 Stat. 1018, 1020–21. As we explain in more detail below, it was

---

[8] It is worth noting the Wyoming Supreme Court, applying *Solem*, held the operative language of the 1905 Act evinced Congress's clear intent to diminish the Reservation. *Yellowbear v. State*, 174 P.3d 1270, 1282 (Wyo. 2008). Specifically, the court concluded the language of cession in Article I was "indistinguishable from the language of *DeCoteau*." *Id.* And upon review of Yellowbear's federal habeas petition, we concluded Yellowbear failed to present any argument "calling into question the correctness of [the Wyoming Supreme Court's] decision." *Yellowbear v. Atty. Gen. of Wyo.*, 380 F. App'x 740, 743 (10th Cir. 2010), *cert. denied sub nom.*, *Yellowbear v. Salzburg*, 562 U.S. 1228 (2011).

-19-

**App.19**

thought this hybrid payment scheme would yield more revenue to the tribes, since they would be paid from the proceeds collected from the homesteaders.

The EPA and the Tribes rely on *Solem*, where the Court held language of cession combined with a sum certain payment creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." 465 U.S. at 470–71. But this presumption is not a two-way street. In *Hagen*, the Court expressly rejected the argument that a finding of diminishment requires "both explicit language of cession or other language evidencing the surrender of tribal interests *and* an unconditional commitment from Congress to compensate the Indians." 510 U.S. at 411 (emphasis added). The Court explained, "While the provision for definite payment can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion." *Id.* at 412. The Court continued, "In fact, the statutes at issue in *Rosebud*, which we held to have effected a diminishment, did not provide for the payment of a sum certain to the Indians." *Id.* And indeed, in *Rosebud*, the Court had likewise noted that a sum certain payment or lack thereof is only one of many textual indicators of congressional intent. 430 U.S. at 598 n.20. Congress's decision to abandon the sum certain method of payment was "not conclusive with respect to congressional intent."[9] *Id.* at 588. What matters most is not the

---

[9] The Court in *Rosebud* added that the act at issue was not completely devoid of a guaranteed payment. The Court observed, "[d]espite this 'uncertain
(continued...)

**App.20**

mechanism of payment, but rather the "language of immediate cession." *Id.* at

597.

Finally, the EPA and the Tribes argue the trusteeship language in the 1905

Act demonstrates that Congress merely meant for the United States to hold the

land in trust for the Tribes until it was sold. The Act therefore effected no change

in ownership until parcels were sold to settlers. In particular, the EPA and the

Tribes point to Article IX of the Act, which provides,

> [N]othing in this agreement contained shall in any manner
> bind the United States to purchase any portion of the lands
> herein described or to dispose of said lands except as
> provided herein, or to guarantee to find purchasers for said
> lands or any portion thereof, it being the understanding
> that United States shall act as trustee for said Indians to
> dispose of said lands and to expend for said Indians and
> pay over to them the proceeds received from the sale
> thereof only as received, as herein provided.

33 Stat. at 1020–21. In support of this argument, the EPA relies on similar

language the Court considered in *Ash Sheep Co. v. United States*, 252 U.S. 159

(1920). But *Ash Sheep* is of limited utility in light of the Court's more recent

---

[9](...continued)
sum' proviso," the act mandated that "all lands herein ceded and opened to
settlement . . . remaining undisposed of at the expiration of four years from the
taking effect of this Act, shall be sold and disposed of for cash . . . ." *Rosebud*,
430 U.S. at 596 n.18 (citation omitted). In the Court's words, such arrangement
"suggests that Congress viewed this land as disestablished immediately." *Id*.
Similarly, here, the 1905 Act requires "[t]hat any lands remaining unsold eight
years after the said lands shall have been opened for entry may be sold to the
highest bidder for cash without regard to the above minimum limit of price."
33 Stat. at 1021.

**App.21**

precedent, in which it has concluded trust status is not incongruous with

diminishment.  And indeed, *Ash Sheep* is seldom mentioned in subsequent cases,

because it dealt with the question whether lands became "public lands"—a

question the Court has stated is "logically separate" from diminishment.  *See*

*Rosebud*, 430 U.S. at 601 n.24.

    In any event, it is clear trust status can exist even if a reservation has been

diminished.  In *Rosebud*, for example, the Court considered a series of statutes in

which the United States did not promise to find purchasers for the lands, but

rather agreed to act as trustee for the Indians to dispose of the lands and collect

and distribute the proceeds.  430 U.S. at 596, 608.  The Court held congressional

intent was to diminish the Rosebud Reservation, notwithstanding the trusteeship

provisions.  *See id*. 430 U.S. at 615.  The Court agreed with the Eighth Circuit

that "'the fact that a beneficial interest is retained does not erode the scope and

effect of the cession made, or preserve to the reservation its original size, shape,

and boundaries.'"  *Id.* at 601 n.24 (quoting *Rosebud Sioux Tribe v. Kneip*, 521

F.2d 87, 102 (8th Cir. 1975)).  Even the dissent acknowledged, "[o]f course, it is

possible that Congress intended to remove the opened counties from the

Reservation while leaving the Indians with a host of rights in the counties."

*Rosebud*, 430 U.S. at 622.

    In sum, the express language of cession in the 1905 Act indicates Congress

intended to diminish the boundaries of the Wind River Reservation,

-22-

**App.22**

notwithstanding the lack of a sum certain payment and the inclusion of a

trusteeship provision.

### B. *The Historical Context of the Act*

The contemporary historical context further confirms Congress intended to

diminish the Wind River Reservation when it passed the 1905 Act.  Although we

believe the plain statutory language is precisely suited to diminishment, we also

consider "the manner in which the transaction was negotiated with the tribes

involved and the tenor of legislative reports presented to Congress."  *Solem*, 465

U.S. at 471; *see also Yankton Sioux*, 522 U.S. at 351.  As the Supreme Court has

stated, "[e]ven in the absence of a clear expression of congressional purpose in

the text of a surplus land Act, unequivocal evidence derived from the surrounding

circumstances may support the conclusion that a reservation has been

diminished."  *Id.*  Of course, here, we need not search for unequivocal evidence,

for the statutory language evinces a congressional intent of diminishment.  But

our scrutiny of the circumstances surrounding the 1905 Act confirms Congress

indeed intended to diminish the Reservation's boundaries.

The legislative history and the negotiations leading up to the 1905 Act

reveal Congress's longstanding desire to sever from the Wind River Reservation

the area north of the Big Wind River.  As in *Rosebud*, "[a]n examination of the

legislative processes which resulted in the 190[5] Act convinces us . . . that this

purpose was carried forth and enacted."  430 U.S. at 592.  "Because of the history

**App.23**

of the . . . Agreement, the 190[5] Act cannot, and should not, be read as if it were the first time Congress had addressed itself to the diminution of the [Wind River] Reservation." *See id.*

In 1891, Congress drafted a bill that, had it passed, would have changed the Reservation's boundaries to exclude the land north of the Big Wind River. Under the 1891 agreement, the Tribes were to "cede, convey, transfer, relinquish and surrender, forever and absolutely . . . all [the Tribes'] right, title, and interest, of every kind and character, in and to the lands, and the water rights appertaining thereunto" for the sum of $600,000. H.R. Exec. Doc. No. 52-70, at 29, 30 (1892). Though Congress did not ratify this agreement, two years later the Secretary of the Interior sent another commission to negotiate with the Tribes for the sale of the land north of the Big Wind River. This time, the United States asked for additional land and offered the Tribes $750,000. H.R. Exec. Doc. No. 53-51, at 4 (1894). Despite the higher offer, the Tribes refused three different proposals, and no agreement was reached.[10]

Congressional activity resumed in 1904, when Representative Frank Mondell of Wyoming introduced a bill to further reduce the Wind River Reservation. The 1904 Mondell Bill was based on the 1891 and 1893 proposals. But by 1904, the Supreme Court had declared that Congress had plenary authority

---

[10] Congress did successfully obtain the land around the Big Horn Hot Springs through the Thermopolis purchase in 1897. 30 Stat. at 94.

over relations with Native Americans, so Congress no longer needed tribal approval to change reservation boundaries. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903). As Representative Thomas Frank Marshall, the Chairman of the Committee on Indian Affairs wrote, the 1904 Bill "propose[d] to reduce the reservation, as suggested . . . at the time of the making of the agreement of 1891 . . . ." H.R. Rep. No. 58-2355, at 3 (1904).

The Mondell Bill, however, differed from the 1891 agreement in several respects. One amendment—and one the EPA and the Tribes point to—was the elimination of the $600,000 sum certain payment. To that, Representative Marshall explained, "[The Mondell Bill] follows as closely as possible, under the changed conditions and the *present policy* of Congress relative to payments for lands purchased from Indians, the agreement of 1891 and the bill prepared at the time for carrying out the provisions of that agreement." H.R. Rep. No. 58-2355, at 4 (emphasis added). "[The bill] follows the now established rule of the House of paying to the Indians the sums received from the ceded territory under the provisions of the bill." H.R. Rep. No. 58-2355, at 2; *see also* H.R. Rep. No. 58-2355, at 8 (quoting letter from then-Acting Commissioner to the Secretary of the Interior A. C. Tonner explaining structure of payment framework). Thus, to comply with prevailing policy, the sum certain payment was excised and replaced with a framework whereby lands would be sold at different times and at different prices with the proceeds to be transferred to the Tribes. And, incidentally, it was

-25-

**App.25**

believed that the Tribes could realize greater compensation under such a framework.  H.R. Rep. No. 58-2355, at 4 (observing "[t]he amount which the Indians would receive at $1 an acre would be $1,480,000").  As the Supreme Court has previously recognized, Congress adopted "'a new policy in acquiring lands from the Indians [by] provid[ing] that the lands shall be disposed of to settlers . . ., and to be paid for by the settlers, and the money to be paid to the Indians only as it is received . . . from the settlers.'"  *Rosebud*, 430 U.S. at 592 (footnote omitted) (alterations in original).

Given these congressional directives, in April 1904, Indian Inspector James McLaughlin met with the Tribes and presented the terms of the Mondell Bill in a series of meetings on the Wind River Reservation.[11]  McLaughlin opened by stating,

> My friends, I am sent here at this time by the Secretary of the Interior to present to you a proposition for the opening of certain p[or]tions of your reservation for settlement by the whites.  It is believed that it will be to the best interests of your two tribes *to cede to the United States* the portions referred to.

---

[11]  McLaughlin, who had also negotiated the 1897 Thermopolis Purchase, negotiated many land agreements with Native American tribes, including the Lower Brules, the Otoes, the Missourias, the Klamaths, the Modocs, the Yankton, the Sioux, the Red Lake Chippewas, the Mille Lacs Chippewas, the Pah-Utes, and the Standing Rock Sioux.  James McLaughlin, *My Friend the Indian* 295 (1910).  The Supreme Court has reviewed agreements he negotiated that resulted in diminishment in a number of cases, including *Rosebud* and *Hagen*.

-26-

**App.26**

Minutes of Council between James McLaughlin, U.S. Indian Inspector, and the Indians of the Eastern Shoshone and Arapaho Tribes, at 2 (Apr. 19–21, 1904) (emphasis added) (reproduced in JA 509–36) [Council Minutes].  But McLaughlin explained that since his last agreement with the Tribes, Congress's policy for paying for ceded land had changed: "For several years past there has been a sentiment in Congress . . . opposed to paying the Indians a lump sum consideration for their lands.  Instead of stipulating, or providing in the agreement, a lump sum consideration for any tract of land, they have determined upon giving the Indians the full benefit of the land by paying the Indians from the proceeds of the sale of the land as whitemen settle upon it."  Council Minutes, at 3.  McLaughlin explained to the Tribes that they would "receive more in the aggregate than under the old lump sum agreements."  Council Minutes, at 4.

McLaughlin advised the Tribes during negotiations that the boundaries of the Reservation would change as a result of the Act, just as they would have under the agreement in 1891 and the negotiations in 1893.  He stated,

> I now wish to talk of the *boundaries of the reservation and the residue of land that will remain in your diminished reservation*.  That being a very important matter. . . .  The tract to be ceded to the United States, as proposed by the "Mondell Bill," is estimated at 1,480,000 acres, leaving 800,500 acres in the diminished reservation.

-27-

**App.27**

Council Minutes, at 6 (emphasis added).[12]  McLaughlin informed the Tribes that
"a large reservation is not in your interest," while the reduction would be, and
that Congress could now unilaterally change the boundaries of the Reservation if
the Tribes did not agree.  Council Minutes, at 7.

Conveying the purpose of the Mondell Bill, McLaughlin told the Tribes
that this agreement would allow the Tribes to "dispos[e] of the lands that you do
not need" and that they would "realiz[e] money from the sale of that land, which
will provide you with means to make yourselves comfortable upon your
reservation . . . ."  Council Minutes, at 3.  He also referred to the ceded lands as
"the public domain" and made clear the land on the north side of the Big Wind
River (part of the ceded territory), after the agreement, would be different:

> Those of you who have allotments on the north side of the
> river, if you so desire, can have them cancelled *and come
> within the diminished reservation*. * * *  However, any of
> you who retain your allotments on the other side of the
> river can do so, and you will have the same rights as the
> whiteman, and can hold your lands or dispose of them, as
> you see fit.  On the reservation, you will be protected by

---

[12]  We acknowledge the Supreme Court stated in *Solem* that a "few
scattered phrases" describing agreements as "reducing the reservation," or "the
reservation as diminished," do not indicate a clear congressional purpose to
diminish the boundaries of a reservation.  465 U.S. at 478; *see also id.* at 475 n.17
(reasoning "'diminished' was not yet a term of art in Indian law").  For as the
Court observed, "[I]t is unclear whether Congress was alluding to the reduction in
Indian-owned lands that would occur once some of the opened lands were sold to
settlers or to the reduction that a complete cession of tribal interests in the opened
area would precipitate." *Id*. (citation omitted).  But here we are not limited to a
few ambiguous phrases; rather, we are presented with a more complete set of
circumstances similar to those the Supreme Court credited in *Rosebud*.

the laws that govern reservations in all your rights and
privileges.

Furthermore, all of you who may retain your allotments *off
the reservation*, will not lose any of your rights on the
reservation, and you have rights the same as if you
remained within the diminished reservation. You will
have rights to surplus lands, the timber etc, *although your
home may be on the public domain*.

Council Minutes, at 14 (emphasis added).

The tenor of the Tribes' understanding of the agreement reflects that the

Reservation's boundaries would be diminished. One representative for the

Eastern Shoshone told McLaughlin that his Tribe understood it was "parting with

[its lands] forever and [could] never recover [them] again." Council Minutes, at

17. Long Bear, a chief of the Arapaho Tribe, proclaimed, "I understand what he

comes for . . . and I will tell what part of the Reservation I want to sell. . . . I

want to cede that portion of the reservation from the mouth of the Dry Muddy

Gulch in a direct line to the mouth of Dry or Beaver Creek below Stagner's on

Wind River." Council Minutes, at 9. Rev. Sherman Coolidge of the Arapaho

added he was glad McLaughlin had come "to purchase a portion of our

reservation. The proposed ceded portion has not been used except for

grazing. . . . We need the money that we will get from the sale of these lands for

improvements on the unceded portion." Council Minutes, at 12.

**App.29**

The Tribes and McLaughlin entered into an agreement, *see* Council

Minutes, at 27, and  McLaughlin reported the progress back to Washington.

Specifically, he wrote,

> *The diminished reservation* leaves the Indians the most
> desirable and valuable portion of the Wind River
> Reservation and the garden spot of that section of the
> country.  It is bounded on the north by the Big Wind
> River, on the east and southeast by the Big Popo-Agie
> River, which, being never failing streams carrying a
> considerable volume of water, give natural boundaries
> with well-defined lines; *and the diminished reservation,
> approximately 808,500 acres* . . . allows 490 acres for each
> of the 1,650 Indians now belonging to the reservation.  I
> have given this question a great deal of thought and
> considered every phase of it very carefully and became
> convinced that *the reservation boundary, as stipulated in
> the agreement*, was ample for the needs of the
> Indians . . . .

H.R. Rep. No. 58-3700, at 17 (1905) (emphasis added).  But the 1904 Mondell

Bill as negotiated with the Tribes was never approved.  Instead, it was amended

and codified as a new bill (the 1905 Act), which was approved by Congress on

March 3, 1905.  The legislative history reveals almost no debate about the cession

and payment provisions of the 1905 Act; as discussed, most of the debate had

occurred in the drafting of the 1904 Act.  According to the House Report on the

issue, the 1905 Act was "in harmony" with the Mondell Bill, with "the principal

changes . . . in form rather than substance."  H.R. Rep. No. 58-3700, at 6.

We believe the circumstances surrounding the 1905 Act most closely

resemble those in *Rosebud*.  In 1901, McLaughlin was dispatched to negotiate

-30-

**App.30**

with the Indians on the Rosebud Reservation to cede unalloted portions of their reservation. *Rosebud*, 430 U.S. at 590. They agreed to cede 416,000 acres for a sum of $1,040,000, but the agreement was not ratified because it "'provided that the Government should pay for the lands outright.'" *Id*. at 591 (citation omitted). The Supreme Court observed it was "undisputed" that had the agreement been ratified, it would have changed the reservation's boundaries. *Id*. Working from that baseline, the Court concluded, "An examination of the legislative processes which resulted in the 1904 Act convinces us . . . that this purpose was carried forth and enacted." *Id*. at 592.

Similarly, here, the unratified 1891 agreement with the Tribes served as a predicate for the 1905 Act. Indeed, in introducing the Mondell Bill, Representative Mondell had the 1891 agreement read into the record and then offered amendments to that agreement to reflect the revisions discussed. 38 Cong. Rec. 5,245, 5,245, 5,246–47 (1904). Thus, the actual congressional record belies the EPA's finding that no continuity of purpose existed between the 1891 agreement and the 1905 Act. That provisions were revised to reflect the McLaughlin negotiations and the prevailing policy on compensating Native Americans for ceded land at the time is insufficient reason for severing and rendering irrelevant the circumstances prior to 1904.

Additionally, this case is unlike *Solem* because Congress, through its legislative history, explicitly stated its intent to cede portions of the Reservation.

-31-

**App.31**

*See Solem*, 465 U.S. at 477 (Congress enacted a "sell and dispose" act).

Moreover, the 1905 Act bears the same hallmarks that, as the Supreme Court put it, made *Solem* a "more difficult" case and evidenced diminishment. *Compare id.* at 474 (explaining act permitted "Indians already holding allotments on the opened lands to obtain new allotments . . . 'within the respective reservations thus diminished'" (citation omitted)), *with* 33 Stat. at 1016 ("[A]nd any Indian who has made or received an allotment of land within the ceded territory shall have the right to surrender such allotment and select other lands within the diminished reserve in lieu thereof . . . .").[13]  In the end, Congress's consistent attempts at the

_____

   [13] Likewise, Congress's inclusion or removal of certain provisions in the 1905 Act may cut against diminishment.  First, the Act included a provision that retained the lease rights of one Asmus Boysen and gave him the option to purchase preferential land.  33 Stat. at 1020.  Boysen's agreement with the Tribes contained a clause that would have terminated the lease upon extinguishment of the Tribes' title to covered lands.  JA 4604.  The EPA's decision opined that Congress's concern with the Boysen lease—particularly, its potential for clouding the title of certain opened lands—evinced an intent not to diminish the Reservation's boundaries.  JA 4606–07.  The EPA's understanding of Congress's treatment of the Boysen lease was limited to a finding that "the 1905 Act would retain a Tribal trust interest in the opened lands and that those lands would not be returned to the public domain."  JA 4606.   But as we explained in step one of our analysis, the existence of a trust relationship is not determinative of diminishment, and, unlike *Hagen*, this is not a "public domain" case.  Additionally, the EPA pointed to Congress's removal of a provision that would have required the United States to pay the Tribes for sections 16 and 36 (as school lands) or equivalent lands of each township.  JA 4608–09.  The Supreme Court found the inclusion of such a provision probative of diminishment in *Rosebud* and *Yankton Sioux*.  *See Rosebud*, 430 U.S. at 599–601; *Yankton Sioux*, 522 U.S. at 349–50.  But the record in this case reveals that Wyoming may have received federal land elsewhere in exchange, obviating the need for a school lands provision.

**App.32**

turn of the century to purchase the disputed land compel the conclusion that this intent continued through the passage of the 1905 Act. And the statements in the legislative history about the diminishment of the reservation, when taken together with the Act's plain language, provide ample support for the conclusion Congress understood it was separating the land north of the Big Wind River from the rest of the Wind River Reservation and indeed intended to do so.

### C. *Subsequent Treatment of the Area*

Third and finally, and "[t]o a lesser extent," we can consider "Congress's own treatment of the affected areas, particularly in the years immediately following the opening," as well as "the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands." *Solem*, 465 U.S. at 471. "[A]s one additional clue as to what Congress expected would happen," we also "look to the subsequent demographic history of opened lands." *Id.* at 471–72. But although such evidence can buttress a finding of diminishment based on the statutory text, the Supreme Court "has never relied solely on this third consideration." *Parker*, 136 S. Ct. at 1081. Accordingly, subsequent events "'cannot undermine substantial and compelling evidence from an Act and events surrounding its passage.'" *Osage Nation*, 597 F.3d at 1122 (quoting *Yazzie*, 909 F.2d at 1396). Our review of the subsequent treatment of the area is therefore brief and ultimately does not impact our conclusion Congress intended to diminish the Reservation by the 1905 Act.

**App.33**

From the outset, we note the parties have provided volumes of material evidencing the treatment of the ceded land after the 1905 Act.  Unsurprisingly, each side has managed to uncover treatment by a host of actors supporting its respective position.  Recognizing this inevitability, the Supreme Court has warned that at times "subsequent treatment" may be "so rife with contradictions and inconsistencies as to be of no help to either side." *Solem*, 465 U.S. at 478.  Because we are unable to discern clear congressional intent from the subsequent treatment, we find it is of little evidentiary value.  *See also* JA 4624 (the EPA conceding "Congressional and Executive Branch references to the opened area were inconsistent"); JA 3636 (Solicitor indicating "[t]he evidence from the years immediately after the 1905 Act indicates some inconsistent treatment of the 1905 area").[14]

Nonetheless, we examine some of the more germane evidence.  Perhaps the most telling indication that Congress intended to diminish the Reservation's boundaries in the 1905 Act is the Indian Reorganization Act, 48 Stat. 984 (1934), in which Congress began implementing its new policy of Indian self-determination.  But because the Tribes opted out of the Reorganization Act that would have restored the ceded lands, in 1939, Congress authorized the restoration

———————————————————

[14]  We agree with Judge Lucero that the *Solem* third step tells us little of value, and in fact "irrationally" requires us to infer intent from subsequent demographic developments.  The better guide is statutory text and the historical context that drove Congressional action.

**App.34**

of "all undisposed-of surplus or ceded lands . . . which [we]re not at present under lease or permit to non-Indians," and restored to tribal ownership the "balance of said lands progressively as and when the non-Indians owned the lands."  53 Stat. 1128, 1129–30 (1939).  In administering the land restoration, the Secretary of the Interior sought to "add" the restored lands to, or "make them part of," the Reservation.  For example, in one order, the Secretary stated,

> Now, Therefore, by the virtue of authority vested in the Secretary of the Interior by section 5 of the Act of July 27, 1939 (53 Stat. 1128-1130), I hereby find that the restoration to tribal ownership of the lands described above, which are classified as undisposed of, ceded lands of the Wind River Reservation, Wyoming, . . . will be in the tribal interest, and they are hereby restored to tribal ownership for the use and benefit of the Shoshone-Arapahoe Tribes of Indians of the Wind River Reservation, Wyoming, and are *added to and made part of* the existing Wind River Reservation . . . .

9 Fed. Reg. 9,754 (1944) (emphasis added).  It is difficult to conceive why the Secretary would have used such language if indeed the ceded lands at all relevant times remained part of the Reservation.

Subsequent statements made by Congress also support the conclusion Congress believed the 1905 Act changed the Reservation's boundaries.  In 1907, Congress extended the time for entry onto the ceded territory.  In that Act, Congress referred to the land as "lands *formerly embraced* in the Wind River of Shoshone Indian Reservation, in Wyoming, which were opened for entry."  34 Stat. 849 (1907) (emphasis added); *see also* H.R. Doc. No. 64-1757, at 9 (1916)

**App.35**

(stating "the [irrigation] project under consideration is within the 'ceded lands' portion of *what was formerly included in the Wind River or Shoshone Indian Reservation*" (emphasis added)). Again, Congress's consistent reference to lands that were formerly part of the Reservation is probative of diminishment.

Likewise, some maps from the period indicate the Reservation only included the unopened lands. *See* JA 3638 (explaining 1907 map by the State of Wyoming and 1912 map by the General Land Office purported to show the Reservation's boundaries only encompassed lands unopened by the 1905 Act). But, as the solicitor pointed out in her 2011 opinion, other maps merely reference the ceded lands as "open lands." *Id*. Ultimately, we agree with the solicitor that "[t]hese references are ambiguous and inconsistent at best." *Id*.

We also briefly consider the subsequent demographics of the ceded area, though this consideration is the least probative of congressional intent. *Solem*, 465 U.S. at 471–72. As we have previously stated, "'subsequent events and demographic history can support and confirm other evidence but cannot stand on their own; by the same token they cannot undermine substantial and compelling evidence from an Act and events surrounding its passage.'" *Osage Nation*, 597 F.3d at 1122 (quoting *Yazzie*, 909 F.2d at 1396). Here, the demographic history is mixed. On the one hand, only a small portion of the ceded land was ultimately sold to non-Indians because of disinterest in the area. *See* JA 3638. On the other hand, as the Wyoming Supreme Court has noted, roughly ninety-two percent of

-36-

**App.36**

the population of Riverton—the largest township on the ceded land—is non-Indian. *Yellowbear*, 174 P.3d at 1283. These mixed demographics do not establish that "non-Indian settlers flooded into the opened portion," causing the area to "los[e] its Indian character," *Solem*, 465 U.S. at 471–72; by the same token, they do not undermine our conclusion that the statutory language and historical context of the 1905 Act compel a finding of diminishment.

Finally, jurisdictional and judicial treatment of the area is also mixed and thus has little probative value. Wyoming has previously exercised criminal jurisdiction over parts of the disputed area. For example, in a 1960 opinion the Wyoming Supreme Court found the state had jurisdiction over a crime that occurred north of Riverton in the ceded lands. *Blackburn v. State* 357 P.2d 174, 179–80 (Wyo. 1960). Ten years later, the court held the state had jurisdiction over a murder committed in Riverton. *State v. Moss*, 471 P.2d 333, 339 (Wyo. 1970). And in *Yellowbear*, the court applied the *Solem* factors and concluded "that it was the intent of Congress in passing the 1905 Act to diminish the Wind River Indian Reservation." 174 P.3d at 1284. The court thus determined the state had jurisdiction to prosecute Yellowbear. *Id.* Upon habeas review, we declined to disturb that decision. *Yellowbear*, 380 F. App'x at 743.

On the other hand, both Wyoming and several federal agencies have exercised civil jurisdiction over the disputed area. Aple. EPA Br. 65–66. And in deciding *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes*, we summarily

-37-

**App.37**

referred to the town of Riverton as being within the boundaries of the

Reservation.  623 F.2d 682, 683 (10th Cir. 1980) ("Plaintiffs' land is within the

exterior boundaries of the Wind River Reservation of the Shoshone and Arapahoe

Indians in Wyoming.").  But as the EPA acknowledged in its decision below, *Dry*

*Creek* is "generally unrevealing regarding the legal effect of the 1905 Act," given

that we did not consider the 1905 Act in light of the *Solem* criteria.  JA 4645.

Adding to the varied treatment is the Wyoming Supreme Court's decision

in *In re General Adjudication of All Rights to Use Water in the Big Horn River*

*System (Big Horn I)*, 753 P.2d 76 (Wyo. 1988), *aff'd sub nom. Wyoming v. United*

*States*, 492 U.S. 406 (1989), *overruled in part by Vaughn v. State*, 962 P.2d 149

(Wyo. 1998).  But *Big Horn I* actually tells us little about how courts have treated

the Wind River Reservation.  Contrary to the Tribes' assertion, the court in *Big*

*Horn I* did not interpret the 1905 Act as maintaining a larger Reservation.

Instead, the court merely held the 1905 Act did not evince a clear intent to

abrogate the *water rights* granted to the entire Wind River Reservation at its

creation in 1868.  *Big Horn I*, 753 P.2d at 93–94.  The court never stated that its

allocation of water rights was based upon the Reservation boundaries, nor did it

make a specific finding about those boundaries.

Nevertheless, the Northern Arapaho argue *Big Horn I* bars Wyoming from

challenging the EPA's boundary determination on *res judicata* grounds.  But, as

detailed above, *Big Horn I* concerned the allocation of water rights, specifically

the priority dates for those rights.  753 P.2d at 83.  The special master's

conclusion that the 1905 Act did not sever the 1868 priority date for water rights,

*see id*. at 92, is not determinative on the issue of diminishment—the issues are

mutually exclusive, and Wyoming is not relitigating the water rights

determination.  Indeed, in dispensing of the issue, the Wyoming Supreme Court

merely stated, "A reservation of water with an 1868 priority date is not

inconsistent with the permit provisions of the pre-Winters 1905 Act."  *Id*. at 93.

Even more detrimental to the Northern Arapaho's position, the Wyoming

Supreme Court has since expressly rejected the Tribe's characterization of *Big*

*Horn I*.  In *Yellowbear*, the court stated "while [the majority and the dissent]

disagreed over whether reserved water rights continued to exist in the ceded

lands, the majority and dissent in *Big Horn River* agreed that the reservation *had*

*been diminished*."  174 P.3d at 1283 (emphasis added).

    In sum, on balance the subsequent treatment of the ceded lands neither

bolsters nor undermines our conclusion that the 1905 Act diminished the Wind

River Reservation.

### III.  Conclusion

    For the foregoing reasons, we find Congress diminished the boundaries of

the Wind River Reservation.  We therefore GRANT Wyoming's petition for

review, VACATE the EPA's order, and REMAND for further proceedings

consistent with this opinion.

**App.39**

14-9512 & 14-9514, Wyoming v. United States Environmental Protection Agency
**LUCERO**, J., dissenting.

The "Indian right of occupancy of tribal lands, whether declared in a treaty or otherwise created, has been stated to be sacred." Lone Wolf v. Hitchcock, 187 U.S. 553, 564 (1903). Our respect for this right stems, or should stem, from Tribes' status as "separate sovereigns pre-existing the Constitution." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978). Although Congress possesses the unilateral authority to diminish the reservations of these sovereign nations, Solem v. Bartlett, 465 U.S. 463, 470 n.11 (1984) (citing Lone Wolf, 187 U.S. 553), we must not lightly assume that Congress has exercised this destabilizing power. Only when express statutory language, legislative history, and surrounding circumstances "point unmistakably to the conclusion that" a reservation was diminished should we read a statute as having that effect. DeCoteau v. Dist. Cty. Ct. for Tenth Jud. Dist., 420 U.S. 425, 445 (1975).

In 1905, Congress passed an act transferring certain lands in the Wind River Reservation to the United States. The federal government was to act as trustee by selling the lands and paying the Indians the proceeds. Act of March 3, 1905, 33 Stat. 1016 (the "1905 Act" or the "Act"). From this placement of property into trust status in exchange for a conditional promise of payment, my colleagues in the majority infer clear congressional intent to diminish the Wind River Reservation. I cannot agree. By deriving an intent to diminish absent sum-certain payment or statutory language restoring lands to the public domain, the majority opinion creates a new low-water mark in diminishment jurisprudence. Applying the three-step analysis from Solem, 465 U.S. at

**App.40**

470-71, I would hold that the 1905 Act did not diminish Reservation boundaries.

Accordingly, I respectfully dissent.

## I

Our diminishment analysis begins with the statutory text.  The Court has stated

that "language evidencing the present and total surrender of all tribal interests," when

coupled with an "unconditional commitment from Congress to compensate the Indian

tribe for its opened land," creates a presumption of diminishment.  Solem, 465 U.S. at

470-71; see also DeCoteau, 420 U.S. at 445-49 (finding diminishment based on language

of cession and sum-certain payment).  The 1905 Act states that the Indians "cede, grant,

and relinquish to the United States, all right, title, and interest" to certain lands "within

the said reservation."  33 Stat. at 1016.  But the United States did not agree to pay a sum

certain.  Instead, the Act provides that "the United States shall act as trustee for said

Indians to dispose of said lands and to expend for said Indians and pay over to them the

proceeds received from the sale thereof only as received, as herein provided."  Id. at 1021

(emphasis added).  Moreover, the Act states that "nothing in this agreement contained

shall in any manner bind the United States to purchase any portion of the lands herein

described or to dispose of said lands except as provided herein, or to guarantee to find

purchasers for said lands."  Id. at 1020.  Citing the Act's designation of a portion of the

sale proceeds for per capita payments, the majority adopts the euphemism "hybrid

payment scheme."  (Majority Op. 20.)  However, the terms of the statute unambiguously

reflect a conditional promise to pay.

Because the 1905 Act lacked sum-certain payment, the majority opinion's reliance

on sum-certain cases is misplaced.  It repeatedly asserts that the language of the 1905

Act, like the statutory language in DeCoteau, is "precisely suited" to diminishment.  (See,

e.g., Majority Op. 14 (citing DeCoteau, 420 U.S. at 445).)  But when the Court in

DeCoteau made that observation, it was comparing the statutory language of an 1889

agreement to "that used in the other sum-certain, cession agreements" ratified in the same

act.  420 U.S. at 446 (emphasis added).  The DeCoteau Court distinguished both Seymour

v. Superintendent, 368 U.S. 351 (1962), and Mattz v. Arnett, 412 U.S. 481 (1973), in

part, on the ground that the acts at issue in those cases conditioned payment to the tribes

on the "uncertain future proceeds of settler purchases"—precisely the situation presented

here.  DeCoteau, 420 U.S. at 448.  In contrast, the 1891 act in DeCoteau "appropriate[d]

and vest[ed] in the tribe a sum certain."  Id.

The 1905 Act differs from legislation deemed to have diminished reservations in

another important respect:  It did not restore the lands at issue to the public domain.  Cf.

id. at 446 (citing legislators' statements that "ratified agreements would return the ceded

lands to the 'public domain'" to support claim that agreements unquestionably

diminished reservations).  Because the lands at issue here were held in trust under the

Act, they remained Indian lands.  In Ash Sheep Co. v. United States, 252 U.S. 159

(1920), the Tribe "ceded, granted, and relinquished to the United States all of their right,

title and interest."  Id. at 164 (quotations omitted).  However, the government did not

provide unconditional payment, promising only to give the Indians the future proceeds of

any land sales.  Id. at 164-65.  And, in language nearly identical to the 1905 Act, the

3

**App.42**

statute stated that the United States was not bound to purchase or sell the affected lands but rather to "act as trustee" in their disposal.  Id. at 165-66.  The Court determined, based on this language, that although the Indians had "released their possessory right to the government," the lands remained "Indian lands" because any benefits derived therefrom would belong to the Indians as beneficiaries and not the government as trustee until the lands were sold.  Id. at 166.[1]

Admittedly, the retention of a beneficial interest is not dispositive of reservation status.  See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 601 n.24 (1977).  But the majority too easily dismisses the trust status of the lands at issue.  (See Majority Op. at 21-22.)  "The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century."  Solem, 465 U.S. at 468.  Accordingly, although it is not determinative, Congress' decision not to restore these lands to the public domain cuts strongly against the majority's conclusion that the Reservation was diminished.

Given the absence of sum-certain payment or restoration of lands to the public domain, we could easily interpret the language of cession contained in the 1905 Act as merely opening portions of the Wind River Reservation to settlement.[2]  In assessing

---

[1] The majority states that Ash Sheep is seldom cited in more recent diminishment cases because it addresses the different issue of whether lands became "public lands." (Majority Op. 21-22.)  But in DeCoteau, a case upon which the majority relies, the Court cites Ash Sheep in distinguishing Mattz based on the absence of sum-certain payment. See DeCoteau, 420 U.S. at 448.

[2] As in Solem, the 1905 Act provides that Indians who held an allotment within the opened territory would be permitted to obtain a new allotment in the unopened area,

statutory language nearly identical to the 1905 Act, the Eighth Circuit concluded that the Devils Lake Indian Reservation had not been diminished.  United States v. Grey Bear, 828 F.2d 1286 (8th Cir.), vacated in part on other grounds on reh'g en banc, 836 F.2d 1088 (8th Cir. 1987).  Specifically, the court held that although the language "do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest" was suggestive of diminishment,  id. at 1290 (emphasis omitted) (quoting Act of April 27, 1904, ch. 1620, 33 Stat. 321-22), it did not "evince a clear congressional intent to disestablish the Devils Lake Reservation" absent an "unconditional commitment" by Congress to pay for the ceded lands, id.

The majority attempts to distinguish Grey Bear, noting that the legislative history of the act at issue there was not extensive and that subsequent treatment of the area weighed against a finding of diminishment.  (Majority Op. 17 n.6.)  But the majority does not appear to rest its holding in this case on the second and third steps of the Solem analysis.  Instead, it claims that the "express language of cession in the 1905 Act indicates Congress intended to diminish the boundaries of the Wind River Reservation."  (Id. at 22.)  The majority thus reaches a conclusion squarely opposite to one of our sibling circuits, creating a needless circuit split.

---

referring to the latter as the "diminished reserve."  33 Stat. at 1016; Solem, 465 U.S. at 474 (describing unopened areas as "reservations thus diminished").  But the Supreme Court explained that this phrase "cannot carry the burden of establishing an express congressional purpose to diminish" because at the time of the Act, "'diminished' was not yet a term of art in Indian law."  Solem, 465 U.S. at 475 & n.17.  Thus, Congress "may well have been referring to diminishment in common lands and not diminishment of reservation boundaries."  Id.  Similarly, references to a reservation "in the past tense" should not "be read as a clear indication of congressional purpose to terminate."  Mattz, 412 U.S. at 498-99.

The Supreme Court has counseled that "[w]hen we are faced with . . . two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence:  Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." <u>Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation</u>, 502 U.S. 251, 269 (1992) (quotation and alteration omitted).  Adhering to that principle in this case, we must read the 1905 Act as providing for sale and opening of lands rather than diminishment.

## II

In very limited circumstances, courts have been willing to find diminishment even absent "explicit language of cession and unconditional compensation." <u>Solem</u>, 465 U.S. at 471.  But that is true only if surrounding circumstances "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." <u>Id.</u>  A "few phrases scattered through the legislative history" are insufficient to manufacture clear congressional intent to diminish if a plain statement of that objective is lacking in the statutory text.  <u>Id.</u> at 478.

Legislative history surrounding two ancillary portions of the 1905 Act counsel against an intent to diminish.  First, Congress chose to omit a school lands provision from the 1905 Act, demonstrating its view that the opened lands retained their Reservation status.  A precursor bill, presented to Congress in 1904, initially provided that the United States would pay $1.25 per acre for sections 16 and 36, or equivalent lands, in the opened townships.  38 Cong. Rec. H5247 (1904).  This provision mirrored the Wyoming Enabling Act, which grants sections 16 and 36 of each township to the state for school

6

**App.45**

purposes unless those lands are sold or disposed of, in which case the state may take

other lands in lieu.  Wyoming Enabling Act, ch. 664, § 4, 26 Stat. 222, 222-23 (1890).

During debate on the 1904 bill, Representative Mondell proposed to strike the school

lands provision. 38 Cong. Rec. H5247.  He explained that although "the bill originally

provided that the State should take lands on the reservation" for the price of $1.25 per

acre, eliminating the school lands provision would "leav[e] the State authorized under the

enabling act to take lieu lands."  Id. (statement of Rep. Mondell) (emphasis added).  Both

Mondell's statement and the decision to omit the provision evince the belief that sections

16 and 36 would remain part of the Reservation.  The House Committee on Indian

Affairs later reported that it had adhered to this policy in drafting the bill that would

ultimately become the 1905 Act.  See H.R. Rep. No. 58-3700, pt. 1, at 7 (1905) (stating

that it had been "deemed wise by the committee to adhere to the policy laid down in the

former bill and agreement," under which there was no school lands provision and

"Indians [were] to receive the same rates from settlers for sections 16 and 36 as paid for

other lands").[3]

     Conversely, if a school lands provision is included in a statute, the Supreme Court

has been more apt to find congressional intent to diminish.  In Rosebud, for example, the

---

    [3] Although the Wyoming Enabling Act did not exempt reservations from the grant
of sections 16 and 36 to the state for school purposes, the Wyoming Constitution
disclaims "all right and title to . . . all lands lying within said limits owned or held by any
Indian or Indian tribes."  Wyo. Const. art. XXI, § 26.  Because "Congress is presumed to
act with knowledge of controlling constitutional limitations" when it enacts new statutes,
Golan v. Gonzales, 501 F.3d 1179, 1183 (10th Cir. 2007), the decision to omit the school
lands provision is further evidence Congress believed the opened lands to retain their
reservation status.

Court held that the inclusion of a similar school lands provision evinced "congressional intent to disestablish Gregory County from the Rosebud Reservation, thereby making the sections available for disposition to the State of South Dakota for school sections." 430 U.S. at 601 (quotation omitted); see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 349-50 (1998) (inclusion of school lands provision indicative of intent to diminish).[4] The majority notes that the State of Wyoming may have received federal land elsewhere as a result of Congress' decision to omit the school lands provision. (Majority Op. 32 n.13.) But that is exactly the point. By striking the provision, Congress recognized that Wyoming could take lieu lands elsewhere, rather than pay $1.25 for "lands on the reservation." 38 Cong. Rec. H5247 (statement of Rep. Mondell) (emphasis added); see also 26 Stat. at 222-23.

Also weighing against a finding of diminishment is a provision granting Asmus Boysen a preferential right to lease new lands "in said reservation" in lieu of his existing lease rights. 33 Stat. at 1020. The provision was opposed by a minority in the House of Representatives, who argued that Boysen should not be granted preferential rights because his lease would terminate upon passage of the Act, and because "other persons desiring to enter and settle upon the lands to be opened" should stand on equal footing.

---

[4] In contrast to the Wyoming Enabling Act, the statute admitting North and South Dakota into the Union expressly provided that sections 16 and 36 "embraced in permanent reservations" would not "be subject to the grants . . . of [the] act." Act of February 22, 1889, 25 Stat. 676, 679. However, as discussed in n.3, supra, the Wyoming Constitution served a similar function by disclaiming "all right and title" to lands held by Indian Tribes. Wyo. Const. art XXI, § 26. Accordingly, even if the grant of sections 16 and 36 on the Wind River Reservation was not expressly prohibited by the Wyoming Enabling Act, it makes sense that Congress would not have provided for Wyoming to take lands to which the state had "forever disclaim[ed] all right and title." Id.

**App.47**

H.R. Rep. No. 58-3700, pt. 2, at 2, 3 (emphasis added).  By describing the "lands to be

opened" as being "in said reservation," 33 Stat. at 1020, the 1905 Act demonstrates

Congress' understanding that the opened areas would retain their reservation status.[5]

The majority relies on a prior history of negotiations to conclude that the 1905 Act

resulted in diminishment, citing Rosebud for the proposition that implied continuity in

purpose from a prior agreement is informative.  (See Majority Op. 31 (citing Rosebud,

430 U.S. at 590-92); see also id. at 15 n.2.)  But the negotiation history presented here

differs markedly from that considered by the Court in Rosebud.  In Rosebud, the Rosebud

Sioux Tribe reached an agreement with the United States to diminish reservation

boundaries in 1901.  430 U.S. at 587.  Although Congress failed to ratify the agreement,

the Court concluded that the agreement's purpose was carried out in subsequent acts

passed in 1904, 1907, and 1910.  Id. at 587-88, 592.

There were several factors in Rosebud that are not present in this case.  Notably, a

mere three years passed between the 1901 agreement and the 1904 act in Rosebud.  It

should be unsurprising that congressional intent remained static for such a brief period.

---

[5] Although the trust status of lands is not dispositive of the diminishment issue, the
inclusion of the Boysen provision is further evidence that the opened lands were placed in
trust for the benefit of the Tribes.  Boysen had previously entered into a mineral lease
with the Tribes that included portions of the opened area.  The terms of the lease
provided it would terminate "in the event of extinguishment . . . of the Indian title to the
lands covered by" the agreement.  As discussed, supra, a minority opposed to the
provision argued that there was no need to grant Boysen preferential rights to the opened
lands because his existing lease rights would automatically terminate upon passage of the
1905 Act.  But as Representative Marshall, the chairman of the subcommittee that
considered the Boysen provision, explained, Indian title would not be extinguished
because "these lands are not restored to the public domain, but are simply transferred to
the Government of the United States as trustee for these Indians."  39 Cong. Rec. H1945
(1905) (statement of Rep. Marshall).

9

**App.48**

Here, my colleagues rely extensively on a proposed agreement from 1891, nearly a generation prior to passage of the 1905 Act.  (See Majority Op. 24, 31.)

Further, in Rosebud the reason Congress failed to ratify the prior agreement "was not jurisdiction, title, or boundaries" but "simply put, money."  430 U.S. at 591 n.10 (quotation omitted).  The 1904 act was essentially identical to the 1901 agreement other than the form of payment.  Id. at 594-97.  In contrast, the government and Tribes in this case were unable to reach an agreement as to the particular lands to be opened in either 1891 or 1893.  In 1891, certain members of Congress called for the opening of more lands than what was provided for in the proposed agreement.  H.R. Doc. No. 52-70, at 7-8 (1892).  And the Tribes rejected three separate counteroffers in 1893, indicating they did not wish to sell the lands under discussion.  H.R. Doc. No. 53-51 (1894).  Thus, unlike the three-year delay in Rosebud from an agreement that went unratified because of concerns over the manner of payment, we are presented with a fourteen-year halt following negotiations that failed because the parties could not agree on material terms.

Not only did a significant period of time elapse between the 1891 negotiations and the 1905 Act in this case, but any continuity of purpose was also disrupted by intervening agreements regarding cession of other portions of the Reservation.  In 1896, for example, Inspector McLaughlin successfully negotiated the Thermopolis Purchase Act, under which the Tribes ceded the Big Horn Hot Springs to the United States in exchange for a sum-certain payment of $60,000.  Act of June 7, 1897, 30 Stat. 62, 93-94.  At a council meeting in 1922, McLaughlin expressly distinguished the agreements underlying the 1897 and 1905 Acts, stating that they were "entirely distinct and separate" and that under

10

**App.49**

the 1905 Act, "the government simply acted as trustee for disposal of the land north of

the Big Wind River."

      The absence of a continuity of purpose to diminish the Reservation is further

evidenced by the negotiations preceding passage of the 1905 Act.  In his 1903

negotiations with the Rosebud Tribe, McLaughlin stated that he was there "to enter into

an agreement which is similar to that of two years ago, except as to the manner of

payment."  Rosebud, 430 U.S. at 593.  In this case, McLaughlin did not tell the Tribes in

1904 that he sought to reopen the 1891 or 1893 negotiations.  And although the majority

quotes McLaughlin's use of the word "cede," (Majority Op. 26), he used that term

interchangeably with the concept of "opening . . . certain portions of [the] reservation for

settlement by the whites."  Similarly, any references to a diminished reservation "may

well have been referring to diminishment in common lands and not diminishment of

reservation boundaries."  Solem, 465 U.S. at 475 & n.17.

      Looking to the totality of the circumstances surrounding the 1905 Act, it cannot be

said that they "unequivocally reveal a widely-held, contemporaneous understanding that

the affected reservation would shrink as a result of the proposed legislation."  Solem, 465

U.S. at 471 (emphasis added).  At best, the historical record is mixed regarding Congress'

intent.  As such, it is insufficient to overcome ambiguity in the statutory text.

### III

      At the third step of the Solem analysis, we consider "[t]o a lesser extent . . . events

that occurred after the passage of a surplus land act to decipher Congress's intentions."

Solem, 465 U.S. at 471.  But this third prong comes into play only at the margins.[6]  If "an

act and its legislative history fail to provide substantial and compelling evidence of a

congressional intention to diminish Indian lands, we are bound by our traditional

solicitude for the Indian tribes to rule that diminishment did not take place and that the

old reservation boundaries survived the opening."  Solem, 465 U.S. at 472.

Because the statutory text and legislative history in this case fail to provide

compelling evidence of congressional intent to diminish, we need not consider this third

prong.  Even if we did, however, I agree with the majority that the post-Act record is so

muddled it does not provide evidence of clear congressional intent.  (Majority Op. 34.)[7]

But, as with the first two steps in the analysis, this lack of clarity must not be treated as a

---

[6] Although I acknowledge that controlling precedent permits courts to consider post-enactment events, I feel compelled to remark on the irrational nature of such an inquiry.  The demographic makeup of an area decades or more following passage of a statute cannot possibly tell us anything about the thinking of a prior Congress.  See Philip P. Frickey, A Common Law for Our Age of Colonialism:  The Judicial Divestiture of Indian Tribal Authority Over Nonmembers, 109 Yale L.J. 1, 19 (1999) (noting "[t]he conceptual problem with this approach, of course, is that postenactment developments reveal nothing about original congressional intent, much less intent sufficiently clear to satisfy the canon" requiring ambiguous statutes to be construed in favor of tribal interests).  The Court itself has apparently recognized the dubiousness of this analysis, referring to "de facto" diminishment as a "necessary expedient."  Solem, 465 U.S. at 471, 472 n.13.

The third step of the Solem analysis cannot be meaningfully described as a tool to decipher congressional intent.  Rather, it is a means of ignoring that intent.  Courts should be loath to abandon the proper tools of statutory interpretation in any context, but to do so with respect to Indian law is particularly perverse given our canon of construction that "statutes are to be construed liberally in favor of the Indians."  Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. at 269 (quotation and alteration omitted).

[7] I also agree with the majority that this controversy has not been rendered moot and that the Wyoming Farm Bureau has standing.  (See Majority Op. 10-11 n.1.)

neutral element.  Because we apply a "presumption that Congress did not intend to diminish," Solem, 465 U.S. at 481, proponents of diminishment must show that "non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character," id. at 471.  The appellants have not met this burden.

Land sales in the opened area were largely a failure.  By 1915, less than 10% of the land had been sold to non-Indians, prompting the Department of the Interior ("DOI") to indefinitely postpone further sales.  Less than 15% of the opened area was ultimately transferred to non-Indians.  Cf. Yankton Sioux Tribe, 522 U.S. at 339 (noting that approximately 90% of unallotted tracts were settled in that case); Rosebud, 430 U.S. at 605 (same).  The DOI continued to allot parcels in the opened lands to Tribal members, and in 1939, Congress restored tribal ownership over the unsold land.  Act of July 27, 1939, ch. 387, 53 Stat. 1128.  Today, approximately 75% of the lands opened for settlement by the 1905 Act is held in trust by the United States for the benefit of the Tribes and their members.

Despite the sometimes conflicting treatment of the area by non-Indian authorities, (see Majority Op. 34-39), there can be little doubt that most of the opened area retains its Indian character.  Accordingly, we face no risk of upsetting "justifiable expectations," Rosebud, 430 U.S. at 605, by construing the 1905 Act as maintaining Reservation boundaries.

## IV

We consider in this case an Act that began with Inspector McLaughlin's warning to the Tribes that "Congress had the right to legislate for the opening of Indian

reservations without consulting the Indians or obtaining their consent."  Recognizing that Congress possesses the nearly unfettered power to impose its will, leaving the Tribes "no choice but to consent," the Court has held that "any doubtful expressions in [legislation] should be resolved in the Indians' favor."  Choctaw Nation v. Oklahoma, 397 U.S. 620, 631 (1970).  This rule must be given "the broadest possible scope" in the diminishment context.  DeCoteau, 420 U.S. at 447.  In interpreting the 1905 Act, we must bear in mind the government's "moral obligations of the highest responsibility and trust, obligations to the fulfillment of which the national honor has been committed."  United States v. Jicarilla Apache Nation, 564 U.S. 162, 176 (2011) (citation and quotations omitted).  With this heavy thumb on the scale, I would hold that the 1905 Act did not diminish the Wind River Reservation.  I respectfully dissent.